[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-12148

_____

VIVIANNE JADE WASHINGTON,

Plaintiff-Appellant,

*versus*

INVESTIGATOR JASON DURAND,
in his individual capacity,

Defendant,

INVESTIGATOR HUGH HOWARD,
in his individual capacity,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 3:18-cv-00086-TCB

_____

Before WILLIAM PRYOR, Chief Judge, LAGOA, Circuit Judge, and
SCHLESINGER,* District Judge.

WILLIAM PRYOR, Chief Judge:

This appeal requires us to decide whether an officer must release a suspect detained pursuant to a valid arrest warrant when he learns of possibly exculpatory evidence. During an investigation of the murder of an elderly woman, Vivianne Washington was arrested pursuant to a warrant based on a tip from a confidential informant that she was involved in the crime and a positive photograph identification by a perpetrator who had already confessed. Shortly after the arrest, Officer Hugh Howard of the Meriwether County Sheriff's Office brought Washington in front of the perpetrator, who said, "[T]hat's not her." Howard continued to detain Washington for approximately twenty hours and then released her when the perpetrator confessed that he had lied about Washington. Washington sued Howard and alleged that Howard had an affirmative duty to return to the magistrate to inform him that the

_____

* Honorable Harvey E. Schlesinger, United States District Judge for the Middle District of Florida, sitting by designation.

perpetrator had said, "[T]hat's not her," and that, by not doing so, Howard violated her right to be free from unreasonable seizures under the Fourth and Fourteenth Amendments because there was no longer probable cause to support her detention. *See* 42 U.S.C. § 1983. The district court granted summary judgment in favor of Howard based on qualified immunity. Washington cannot prove that Howard violated her constitutional rights for three reasons: probable cause persisted throughout her detention, Howard was entitled to rely on a facially valid and lawfully obtained warrant, and he did not take an affirmative action to continue the prosecution. Because each reason entitles Howard to qualified immunity, we affirm.

## I. BACKGROUND

On August 4, 2016, four assailants invaded Dorothy Dow's home on her blueberry farm in Meriwether County, Georgia, attacked Dow, and set her on fire. Dow, an elderly woman, later died from her injuries. But before Dow passed away, she identified her assailants as "several black males and an African American female." Howard also received a tip from a farm employee suggesting that he interview Cortavious Heard and Justin Grady. Heard, a former farm employee, was on probation for another crime.

When Howard first contacted him, Heard denied all involvement in the crime and refused to speak with Howard. Later, the police conducted searches of Heard's person and residence, which were permitted by a Fourth Amendment waiver as a condition of his probation. The probation officer found marijuana in

4                   Opinion of the Court                   20-12148

Heard's pocket and some of Dow's possessions in Heard's residence.

After his grandmother encouraged him to do the right thing, Heard confessed to his involvement in the home invasion. Howard arrested Heard, took him to the sheriff's office, and questioned him further about the home invasion. Heard identified Grady—already a person of interest—a "brown-skinned" female, and an unidentified black male as the perpetrators of the invasion and murder. He also said that he had been with his girlfriend, Mina Ellery, and her friend Angel Harmon earlier on the evening of the crime, but that neither was involved in the crime.

While Howard was interrogating Heard, Officer Victor McPhie, a narcotics officer in the city of Newnan, called Officer Chris Warden, a narcotics officer in the Meriwether County Sheriff's Office. McPhie told Warden about a tip received from one of his confidential informants who identified Washington as someone the informant had "heard [] was involved in this." The informant also provided McPhie with a photograph of Washington, which McPhie sent to Warden.

Warden interrupted Howard's interrogation of Heard, told Howard of the tip, and showed Howard the photo. Howard then showed the photo to Heard. Heard positively identified the woman in the photo as the woman who was involved in the invasion and said that the black hat that she was wearing in the photo was the same hat that she had worn during the crime.

Howard then spoke to McPhie to gain more information about the woman in the photograph. Based on the information from the confidential informant, McPhie told the officer Washington's name, that she worked at a pizza place in Newnan, and that she had gone to school with Harmon and Ellery—the two women who were with Heard on the night of the crime. McPhie did not disclose the identity of his confidential informant but represented to Howard that he was a reliable informant whose assistance had been documented and that McPhie had personally used him as a source many times. Washington asserts that there is no evidence that McPhie told Howard this information, but she provides no evidence that contradicts Howard's deposition testimony that McPhie did so.

Then, in coordination with Howard, Officer Jason Durand procured an arrest warrant for Washington. McPhie executed the warrant and arrested Washington at work at 4:45 p.m. An officer then transported Washington to the Meriwether County Sheriff's Office.

The district court and parties disagree about what took place next. At summary judgment, we view all evidence in the light most favorable to and draw all reasonable inferences in favor of the non-moving party, which in this appeal is Washington. *See Williams v. Aguirre*, 965 F.3d 1147, 1156 (11th Cir. 2020). We set forth each account below.

*First*, Washington's account: While Washington was still in her street clothes and before she was booked, Howard informed

Washington of her rights. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Washington invoked her right to counsel before any substantive questioning took place. Howard then took her to be booked. After she was booked and placed in an isolation cell, she told others that she wanted to speak to Howard. Washington signed a waiver of her right to remain silent, and Howard proceeded with the interrogation.

Washington denied knowing Grady and Heard when Howard showed her their photographs. She offered alibi witnesses, asked to have her clothes tested, offered to give Howard access to her phone and its location data, consented to a DNA swab, and continually denied involvement. Howard then returned her to her cell.

On their way to her cell, Washington and Howard passed the cell in which Heard was housed. Howard then asked Heard if Washington was the girl involved in the crime, to which Heard responded, "[T]hat's not her." This statement contradicted his earlier photo identification of Washington as a co-conspirator and perpetrator of the crime. Washington later consented to a polygraph examination, which Howard had suggested to her in the previous interview.

*Second*, Howard's account: Before Washington was booked and while she was still in her street clothes, Howard interviewed Washington but did not "uncover any incriminating information." Howard then intentionally took Washington by Heard on the way to booking, who spontaneously said, "That is her. That is the b*tch

I told you about. That is her." At some point before Washington was fully booked, Howard offered her the opportunity to take a polygraph test. Shortly after being booked, Howard interviewed Washington again and showed Washington photographs of Heard and Grady. Washington admitted she knew the suspects. At some time after this interview, Washington requested the polygraph test.

*Third*, the district court's account: Washington was immediately booked, and within an hour of booking, she was interviewed by Howard. In this first interview, Howard showed Washington photographs of Heard and others who were believed to be involved. Washington denied knowing Heard but admitted that she knew the other people whose photographs she was shown. She ended the interview by requesting to speak with a lawyer. Washington then requested to speak with Howard and recanted her previous statements. She told Howard that she had lied in the first interview and denied all involvement in the crime. After the two interviews, Howard walked Washington by Heard's cell. The district court credited Washington's testimony that Heard retracted his previous identification. Due to the inconsistent statements about whether Washington knew other suspected perpetrators, Howard arranged for Washington to take a polygraph test.

On appeal, Howard argues that the district court correctly recounted the relevant facts. But the sequence of events recounted in his own Statement of the Facts contradicts his argument on this point. Washington *did* state in her deposition that at some time while in detention she admitted to knowing or being related to the

suspects. But before the district court and on appeal, she argues that we should disregard that statement because it was equivocal, she was confused about the exact sequence of events, and the statement is not consistent with the video-recorded evidence. In Howard's deposition, he did not mention Washington's alleged admission, and his testimony instead implies that she did not admit to knowing the other suspected perpetrators. But in the argument section of his brief on appeal, Howard adopts the conclusion of the district court that the admission happened and that it happened before Heard's alleged retraction.

We need not decide whether or when Washington's purported admission occurred because the evidence, including Howard's and Washington's depositions, establishes that the confrontation with Heard happened before booking and before Washington allegedly admitted to knowing at least some of the suspected perpetrators of the crime. Washington has clarified that her position is that the confrontation with Heard happened before any alleged admission. Howard has not offered any contrary evidence to support his argument that Washington's admission happened first. There is support in the record that, if Washington did admit to knowing the suspects, that admission happened after her encounter with Heard. So, viewing the evidence in the light most favorable to Washington, *Williams*, 965 F.3d at 1156, we assume that Howard did not know about Washington's admission before Heard said, "[T]hat's not her."

Both parties again agree on the remainder of the facts. Washington voluntarily took a polygraph test in which she denied all involvement and knowledge of the crime. The administrator of the test reported that there were "physiological responses indicative of deception" in her answers to the questions "Were you in [Dorothy Dow's] house last Thursday night?" and "Were you present when that woman [Dorothy Dow] was beaten and burnt?". After hearing that she had "failed" the polygraph, Washington admitted to being involved in the crime and began to make up details about it, but Howard realized that Washington's account was inconsistent with evidence already gathered at that point. Howard returned Washington to the jail and returned home for the evening.

The next day, Heard asked to speak with Howard. During that interview, he admitted that Washington was not involved, admitted that he had identified her to protect his girlfriend, and identified her and an additional suspect as co-conspirators. Howard pointed out to Heard that his new statements contradicted his previous photograph and in-person identification and asked Heard to take a polygraph examination to help Howard know which story was true. Heard took and passed a polygraph examination in which he said that Washington was not involved.

Howard then cancelled the arrest warrant for Washington and released her. He arranged for a deputy to transport Washington to her home and gave the deputy money to buy Washington

dinner at a McDonald's restaurant. Heard was charged with making false statements.

Washington sued Howard and Durand for violating her Fourth and Fourteenth Amendment rights, *see* 42 U.S.C. § 1983, and for malicious prosecution under Georgia law. After discovery, Howard and Durand filed a motion for summary judgment on all claims. Washington pursued only her Fourth Amendment claim against Howard and voluntarily dismissed all other claims. She also conceded that there was at least arguable probable cause for the arrest warrant.

The district court entered summary judgment after concluding that Howard was entitled to qualified immunity. The district court reasoned that a police officer must release a subject only when arguable probable cause ceases to exist. It concluded that, on its account of the facts, Washington had already admitted to knowing suspected co-conspirators when Heard verbally recanted his identification. Given that sequence of events, the district court concluded that there was "at least arguable probable cause" to detain Washington until Heard passed the polygraph, at which point Washington was immediately released. It also reasoned that when exculpatory evidence that does not negate arguable probable cause comes to light, a police officer "need only act reasonably in continuing the investigation." The district court then concluded that Howard acted reasonably in seeking out polygraphs and re-interviewing Heard.

## II. STANDARD OF REVIEW

We review a summary judgment *de novo. Kingsland v. City of Miami*, 382 F.3d 1220, 1225 (11th Cir. 2004). Summary judgment is only appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Williams*, 965 F.3d at 1156 (quoting FED. R. CIV. P. 56(a)). "[W]e view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant." *Id.* (internal quotation marks omitted).

## III. DISCUSSION

"Qualified immunity shields public officials from liability for civil damages when their conduct does not violate a constitutional right that was clearly established at the time of the challenged action." *Echols v. Lawton*, 913 F.3d 1313, 1319 (11th Cir. 2019) (quoting *Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016)). To receive qualified immunity, the "defendant must first show he was performing a discretionary function." *Barnes v. Zaccari*, 669 F.3d 1295, 1303 (11th Cir. 2012). The plaintiff then bears the burden of proving both that the defendant violated his constitutional right and that "the right was clearly established at the time of the violation." *Id.* Because Washington does not dispute that Howard performed a discretionary function, she bears the burden of proving that he is not entitled to qualified immunity. *See Williams*, 965 F.3d at 1156–57.

Washington argues that Howard, by continuing to detain her pursuant to a facially valid arrest warrant after uncovering exculpatory evidence, violated her clearly established Fourth Amendment right to be free from unreasonable seizures pursuant to legal process. She contends that her allegedly prolonged detention was not supported by probable cause and so was not justified by the arrest warrant. We have never addressed the "contours and prerequisites," *id.* at 1159 (quoting *Manuel v. City of Joliet*, 137 S. Ct. 911, 920 (2017)), of a Fourth Amendment claim in this precise circumstance—where a seizure based on a warrant was supported by probable cause but was later undermined by contrary exculpatory evidence. *See Barnett v. MacArthur*, 956 F.3d 1291, 1301 n.7 (11th Cir. 2020) ("express[ing] no view" on this question).

For a seizure through process, we have explained that a "plaintiff must prove (1) that the defendant violated his Fourth Amendment right to be free from seizures pursuant to legal process and (2) that the criminal proceedings against him terminated in his favor." *Luke v. Gulley*, 975 F.3d 1140, 1144 (11th Cir. 2020). In defining the "contours and prerequisites" of these Fourth Amendment claims under section 1983, we are "guide[d]" by well-settled "[c]ommon-law principles" that governed actions for malicious prosecution when Congress enacted section 1983 in 1871. *Manuel*, 137 S. Ct. at 920–21; *accord Williams*, 965 F.3d at 1157, 1159. Although "[w]e cannot elevate the common law over the Constitution," *Williams*, 965 F.3d at 1157, those common-law principles

"serv[e] . . . as . . . inspired examples." *Manuel*, 137 S. Ct. at 921 (internal quotation marks omitted).

Washington cannot prove that Howard violated her Fourth Amendment right for three reasons. First, probable cause persisted throughout her detention. Second, Howard was entitled to rely on the facially valid and lawfully obtained warrant. And third, Howard did not affirmatively act to continue the prosecution against her. We discuss each reason in turn.

### A. *Washington's Continued Detention Was Supported by Probable Cause.*

Probable cause renders a seizure pursuant to legal process reasonable under the Fourth Amendment. *See Grider v. City of Auburn*, 618 F.3d 1240, 1256 (11th Cir. 2010). Consequently, "the presence of probable cause defeats" a claim that an individual was seized pursuant to legal process in violation of the Fourth Amendment. *Black v. Wigington*, 811 F.3d 1259, 1267 (11th Cir. 2016). So, to prove a Fourth Amendment violation, Washington must prove that there was no probable cause for her continuing detention.

We have not always consistently articulated the probable-cause standard in the context of arrests. In 2018, the Supreme Court explained that probable cause exists when the facts, considering the totality of the circumstances and viewed from the perspective of a reasonable officer, establish "a probability or substantial chance of criminal activity." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (internal quotation marks omitted). Probable cause does

not require conclusive evidence and "is not a high bar." *Id.* (internal quotation marks omitted). A reviewing court must simply ask "whether a reasonable officer *could* conclude . . . that there was a substantial chance of criminal activity." *Id.* at 588 (emphasis added) (internal quotation marks omitted). One of our decisions applied at least a part of this standard and concluded that there was probable cause. *See United States v. Leonard*, 4 F. 4th 1134, 1146 (11th Cir. 2021) (determining whether there was a "substantial chance of criminal activity" (quoting *Wesby*, 138 S. Ct. at 586)). But, even after the Supreme Court clarified the standard in *Wesby*, we have articulated a different standard that predates *Wesby*. *See Cozzi v. City of Birmingham*, 892 F.3d 1288, 1293 (11th Cir. 2018) (citing *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002)); *accord United States v. Wilson*, 979 F.3d 889, 908 (11th Cir. 2020); *Hardigree v. Lofton*, 992 F.3d 1216, 1230 (11th Cir. 2021); *Crocker v. Beatty*, 995 F.3d 1232, 1243–44 (11th Cir. 2021). The older standard requires "facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information . . . [that] *would* cause a prudent person to believe . . . that the suspect has committed, is committing, or is about to commit an offense." *E.g.*, *Hardigree*, 992 F.3d at 1230 (emphasis added) (quoting *Kingsland*, 382 F.3d at 1226).

The older standard is more demanding than the *Wesby* standard. The older standard requires facts and circumstances such that all prudent people would affirmatively believe that the suspect has already engaged in or will shortly engage in criminal behavior.

*Cozzi*, 892 F.3d at 1293 ("Probable cause exists when the facts . . . *would cause* a prudent person to *believe* . . . that the suspect has committed . . . an offense." (emphases added) (internal quotation marks omitted)). But the *Wesby* standard requires only that it be reasonable for any particular officer to conclude that there is a substantial chance of criminal activity. *Wesby*, 138 S. Ct. at 588. In practice, it is unclear whether our application of the older standard has actually been more demanding. *See, e.g.*, *Crocker*, 995 F.3d at 1243–45 (reciting the older standard but concluding that there was probable cause because the facts "could cause a prudent person to believe" the suspect had broken the law (internal quotation marks omitted)).

Some of our decisions have also used a variant of the older standard that does not use the word "would" but does require an affirmative belief that the suspect had already engaged in or was engaging in a criminal offense. *See Gates v. Khokhar*, 884 F.3d 1290, 1298 (11th Cir. 2018) ("Probable cause exists where the facts . . . are sufficient to cause a person of reasonable caution to believe that a criminal offense has been or is being committed." (internal quotation marks omitted)); *Huebner v. Bradshaw*, 935 F.3d 1183, 1187 (11th Cir. 2019); *United States v. Mancilla-Ibarra*, 947 F.3d 1343, 1349 (11th Cir. 2020); *Alston v. Swarbrick*, 954 F.3d 1312, 1318 (11th Cir. 2020). And in some decisions, we have recited both the older standard and the *Wesby* standard, apparently considering them equivalent. *See Manners v. Cannella*, 891 F.3d 959, 968–69 (11th Cir. 2018); *Gill ex rel. K.C.R. v. Judd*, 941 F.3d 504, 516–17

(11th Cir. 2019); *Paez v. Mulvey*, 915 F.3d 1276, 1285–86, 1288 (11th Cir. 2019); *see also Barnett*, 956 F.3d at 1296–97 (addressing whether it was beyond a reasonable doubt that probable cause had dissipated).

We have a "well-established approach to resolving conflicts in our precedent." *Williams*, 965 F.3d at 1163. First, if possible, we distill a "basis of reconciliation" from the "apparently conflicting" decisions and then "apply that reconciled rule." *Id.* (internal quotation marks omitted). But "only the holdings of prior decisions bind us," *id.*, so legal principles set forth outside of the decision's holding do not bind us. Then, if reconciliation is not possible, "we must follow the earliest precedent that reached a binding decision on the issue." *Id.*

The decisions reciting the older standard or its variant fall into two categories. First, several of our decisions recited the older standard or its variant but then concluded that there was probable cause to support the seizure. *Gates*, 884 F.3d at 1298 (concluding that the officers "had actual probable cause"); *Manners*, 891 F.3d at 969 (concluding that there was "both arguable and actual probable cause to arrest [the suspect] for fleeing"); *Paez*, 915 F.3d at 1288 (concluding that "the affidavits would have established . . . probable cause"); *Huebner*, 935 F.3d at 1189 (concluding that the facts were "enough to give [the officer] probable cause"); *Gill*, 941 F.3d at 516–17 (concluding that "[r]easonable officers would have believed that probable cause existed"); *Mancilla-Ibarra*, 947 F.3d at 1349–50 (concluding that "[t]he officers had probable cause to

arrest Mancilla-Ibarra"); *Wilson*, 979 F.3d at 909 (concluding that the officer "had probable cause to believe Wilson committed a criminal offense"); *Crocker*, 995 F.3d at 1244 ("We agree with the district court that Officer Beatty had probable cause to arrest Crocker."). If we had applied the *Wesby* standard, which sets a lower bar, we would have necessarily reached the same conclusions—that there was probable cause. Because applying the *Wesby* standard would not have altered the judgment or fundamental reasoning of these decisions, they do not require us to apply the older standard. *Cf.* BRYAN GARNER ET AL., THE LAW OF JUDICIAL PRECEDENT § 4, at 47 (2016) (If changing the "questioned proposition . . . wouldn't require alteration of the court's judgment or the reasoning that supports it, then the proposition is dictum." (internal quotation marks omitted)).

The second set of decisions that recited the older standard or its variant concluded that there was not probable cause. *Manners*, 891 F.3d at 969–70 (concluding that there was not probable cause "for running a stop sign"); *Cozzi*, 892 F.3d at 1297 (concluding that there was no arguable probable cause); *Alston*, 954 F.3d at 1319 (concluding that there was no arguable probable cause for either of the two crimes at issue); *Hardigree*, 992 F.3d at 1230 (concluding that "no arguable probable cause existed for any of these offenses"); *see also Barnett*, 956 F.3d at 1296–97, 1299 ("[A] jury could find . . . that there was no longer probable cause . . . ."). For these decisions to bind us to applying the older standard, the underlying facts must have satisfied the *Wesby* standard but not the

older standard. If so, then applying the *Wesby* standard instead of the older standard "would[] require alteration of the court's judgment." GARNER ET AL., *supra*, § 4, at 47. But if there would have been no probable cause even if we had applied the *Wesby* standard, these decisions would not require us to apply the older standard.

In every decision, faithful application of the *Wesby* standard would have led to the same conclusion that there was no probable cause, so we are not bound to apply the older standard. For example, in *Manners v. Cannella*, Officer Cannella testified that he saw Manners disobey a stop sign, but Manners said that he obeyed the stop sign. 891 F.3d at 969–70. On Cannella's motion for summary judgment, we accepted Manners's account and concluded that "a reasonable factfinder could find that Cannella neither saw nor reasonably thought he saw Manners run a stop sign." *Id.* at 970. If a reasonable officer neither saw nor reasonably thought he saw a vehicle run a stop sign, then he could not have concluded "that there was a substantial chance of criminal activity." *Wesby*, 138 S. Ct. at 588 (internal quotation marks omitted).

In another decision that recited that older standard, *Cozzi v. City of Birmingham*, a police officer arrested Cozzi based on two tips from unknown informants that Cozzi looked like a perpetrator in a crime scene surveillance video. 892 F.3d at 1292–93. Cozzi's roommate had told the officer that the perpetrator had an armful of tattoos but that Cozzi did not, *id.* at 1292, and the police officer found nothing in executing a search warrant on Cozzi's home that tied him to the crime, *id.* at 1297. In these circumstances—

especially in the light of the tattoo discrepancy—no reasonable officer could have reasonably concluded that there was a substantial chance that Cozzi was the perpetrator.

In *Alston v. Swarbrick*, we recited a variant of the older standard and concluded that Officer Swarbrick did not have probable cause to arrest Alston. 954 F.3d at 1318–19. Alston argued that Swarbrick "arrested him based merely on [Alston] refusing to answer questions and spouting obscenities while walking away." *Id.* at 1319. Swarbrick asserted that he had probable cause to arrest Alston based on two Florida statutes that criminalized disorderly conduct and resisting an officer without violence. *Id.* at 1318–19. But it was well established that neither statute could be violated by "mere words" and that "mere words would not suffice to provide probable cause for resisting without violence." *Id.* (internal quotation marks omitted). Given the clear contours of the law, Swarbrick could not have reasonably concluded that there was a substantial chance that Alston violated either statute by his silence or obscenities.

In another decision, *Hardigree v. Lofton*, we recited the older standard and concluded that there was no arguable probable cause. 992 F.3d at 1230. Officer Lofton argued that he had probable cause to arrest Hardigree for disorderly conduct, obstruction, and battery. *Id.* at 1230. On a contested record, we assumed that there was no physical contact and that Hardigree simply obeyed the police officers' commands. *Id.* at 1230–31. Of course, a police officer who observes a suspect obeying commands without making any

20                Opinion of the Court                20-12148

physical contact could not have concluded from that observation that there was a substantial chance of criminal activity.

And finally, in *Barnett v. MacArthur*, we recited both standards and addressed whether probable cause persisted throughout the duration of a warrantless arrest. 956 F.3d at 1296–97. Barnett was arrested on suspicion of driving under the influence. *Id.* at 1295. While at the jail, she took two breathalyzer tests, each of which resulted in readings of 0.000—that is, there was no alcohol in her bloodstream—and posted bond. *Id.* at 1295–96. On the sheriff's motion for summary judgment, we accepted as true Barnett's account that she displayed no signs of intoxication at any point leading up to her arrest or during her detention. Although we had to assume that there was probable cause for the initial arrest, *id.* at 1296 n.3, we concluded that Barnett's account of the facts "show[ed] beyond a reasonable doubt that," after her breathalyzer tests, "there was no longer probable cause to continue holding Ms. Barnett." *Id.* at 1299. Even under the *Wesby* standard, no reasonable officer could have concluded that there was even a substantial chance she had been driving under the influence.

We conclude that the correct legal standard to evaluate whether an officer had probable cause to seize a suspect is to "ask whether a reasonable officer could conclude . . . that there was a substantial chance of criminal activity." *Wesby*, 138 S. Ct. at 588. Here, Washington argues that probable cause dissipated after her encounter with Heard because his later in-person statement negated his earlier photograph identification. She seems to assert that

Heard's in-person retraction was, if anything, more reliable than his photograph identification, so the information Howard had gained from Heard up to that point was at most neutral. And analyzing the tip alone, she argues that it was not specific enough to support even arguable probable cause.

Although Heard's statement—if true—was exculpatory, Howard was not required to believe it or to weigh the evidence in such a way as to conclude that probable cause did not exist. Because "probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts," *Wesby*, 138 S. Ct. at 588, a police officer need not resolve conflicting evidence in a manner favorable to the suspect. And instead of focusing on a single piece of evidence "in isolation" and dismissing any evidence with "an innocent explanation," we must look at the "totality of the circumstances." *Id.* at 589 (internal quotation marks omitted).

There were "plenty of reasons to doubt" Heard's in-person identification. *Cf. id.* (explaining that there were "plenty of reasons to doubt [the suspects'] protestations of innocence"). He and his co-conspirators had shown that they were lawbreakers—indeed, violent ones—willing to beat an elderly woman and set her on fire in the hope of acquiring a few thousand dollars to split between them. And only after Heard had spoken to his grandmother about doing the right thing did he confess to his own involvement. He then identified his co-conspirators and assisted the police with the investigation. Howard then purposefully surprised him by bringing an alleged co-conspirator to his cell and asking whether she was the

person he had previously identified, which would have suggested that Heard had pointed the finger at her. If Washington had actually been a co-conspirator, it would be no surprise that Heard contradicted his previous identification in the presence of someone who would have a strong motive to exact revenge and tell his other co-conspirators about his role in their arrest. Howard was entitled to discount this retraction.

So, even crediting Washington's account that Heard said, "[T]hat's not her," during their encounter, probable cause supported her continued detainment. After the encounter, Howard had an anonymous tip that included information about the suspect, a photograph of the suspect provided by the same informant, and an accusation that the suspect was involved. The confidential informant who supplied the tip, photograph, and accusation had been reliable and had worked with the police on other occasions. And Heard, who had already confessed to the police to having committed the crime and previously stated that a female was present, identified the person in the photo—Washington—as being a co-conspirator and perpetrator of the crime. On the strength of a tip from a reliable confidential informant and an identification by a co-conspirator who appeared to be fully cooperating with the police before his later in-person contradiction, which there were many reasons to not take at face value, a reasonable officer "could [have] conclude[d] . . . that there was a substantial chance" Washington was involved. *See id.* at 588 (internal quotation marks omitted).

Because probable cause supported Washington's detention even after Heard's statement, her continued detention was reasonable under the Fourth Amendment. *See Black*, 811 F.3d at 1267. So, because Washington cannot prove that Howard "violated [her] Fourth Amendment right," *Luke*, 975 F.3d at 1144, Washington's Fourth Amendment claim fails.

Washington also cannot prove that her right was clearly established. A right is clearly established only if "the state of the law on the date of the alleged misconduct," *Hardigree*, 992 F.3d at 1224, "makes it obvious that the defendant's acts violated the plaintiff's rights in the specific set of circumstances at issue," *Gates*, 884 F.3d at 1297 (alterations adopted) (internal quotation marks omitted). Washington cannot "identify" a "controlling case or robust consensus of cases," *Wesby*, 137 S. Ct. at 590–91 (internal quotation marks omitted), from the Supreme Court, this Circuit, or the Georgia Supreme Court where a suspect's in-person retraction of an earlier photo identification negated the original identification or caused probable cause to dissipate. *See Bradley v. Benton*, 10 F. 4th 1232, 1242–43 (11th Cir. 2021) (explaining that only "decisions from the United States Supreme Court, this Court, or the relevant state supreme court" are relevant in determining whether the law was clearly established). And it follows from our conclusion that there was probable cause that "existing precedent" did not place the question of whether Howard violated her constitutional rights "beyond debate." *See Wesby*, 137 S. Ct. at 590 (internal quotation marks omitted).

### B.  *Howard Was Entitled to Rely on The Facially Valid and Lawfully Obtained Warrant.*

Washington argues that Howard was not entitled to rely on the arrest warrant in continuing to detain her because evidence later arose that caused probable cause to dissipate. She contends that Howard was constitutionally required to return to the magistrate with the newly discovered evidence and allow the magistrate to reevaluate whether there was probable cause. Only then could he rely on the warrant to continue to detain Washington. We disagree.

In *Manuel v. City of Joliet*, the Supreme Court held that, "if the [probable-cause] proceeding is tainted . . . by fabricated evidence—and the result is that probable cause is lacking, then the ensuing pretrial detention violates the" Fourth Amendment. 137 S. Ct. at 920 n.8. It explained that that "wrongful [pretrial] detention . . . unsupported by probable cause" is "constitutionally unreasonable" because the Fourth Amendment "guarantee[s] a fair and reliable determination of probable cause as a condition for any significant pretrial restraint." *Id.* at 917–19 (internal quotation marks omitted). There, the probable cause hearing that purported to support the suspect's detention "did not expunge Manuel's Fourth Amendment claim because the *process* he received failed to establish . . . probable cause" due to the "taint[]" of "fabricated evidence." *Id.* at 919–20, 920 n.8 (emphasis added). An officer who intentionally or recklessly makes material misstatements or omissions to or fabricates evidence and puts it before a "neutral and

detached magistrate," *Johnson v. United States*, 333 U.S. 10, 14 (1948), violates the Fourth Amendment because "[l]egal process has gone forward, but it has done nothing to satisfy the Fourth Amendment's probable-cause requirement." *Manuel*, 137 S. Ct. at 918–19; *accord Hupp v. Cook*, 931 F.3d 307, 324 (4th Cir. 2019); *see also Sykes v. Anderson*, 625 F.3d 294, 317 (6th Cir. 2010) ("[P]olice officers . . . cannot hide behind the officials whom they have defrauded." (internal quotation marks omitted)). An officer might also violate the Fourth Amendment if he "should have known that his application failed to establish probable cause" and nevertheless obtained the warrant. *Williams*, 965 F.3d at 1165.

In contrast with the invalid probable-cause determination in *Manuel*, a valid and lawfully obtained warrant shields an officer from liability because the officer's reliance on the magistrate's probable-cause determination renders the officer's actions reasonable. *Cf. Elsee v. Smith* (1822) 1 Dowl. & Ry. 97, 104 (Eng.) (opinion of Holroyd, J.) ("If the warrant issued without due authority on the part of the magistrate, that would be trespass in the magistrate."). If an officer fully and honestly places evidence before the magistrate, reasonably believing that there is probable cause, those "procedural steps . . . afford a shield against a Fourth Amendment claim." *Hupp*, 931 F.3d at 324; *cf. Manuel*, 137 S. Ct. at 919 (explaining that the probable-cause determination "lacked any proper basis" and therefore "violated [the] Fourth Amendment" because "[a]ll that the judge had before him were police fabrications"). To be sure, a police officer cannot lie or omit material evidence in later

testimony to continue detention, such as at an arraignment, indictment, or bond hearing. *See Manuel*, 137 S. Ct. at 920 n.8 (explaining that fabricated evidence can result in a Fourth Amendment violation "[w]hatever [the] precise form . . . [of] the proceeding"). But the discovery of exculpatory evidence after a determination of probable cause does not undermine the validity of a detention based on a judicial order. *See Brooks v. City of Winston-Salem*, 85 F.3d 178, 184 (4th Cir. 1996) ("Once a pretrial seizure has been rendered reasonable by virtue of a probable cause determination by a neutral and detached magistrate, the continuing pretrial seizure of a criminal defendant—either by detention or by bond restrictions—is reasonable."); *see also Baker v. McCollan*, 443 U.S. 137, 144–46 (1979) (explaining that the warrant requirement and speedy-trial guarantee form the constitutional protections against deprivations of liberty).

Washington cannot prove that Howard violated her Fourth Amendment right because she cannot prove that the warrant was facially invalid or unlawfully obtained. Washington does not dispute that Howard detained her pursuant to an arrest warrant, and Howard does not dispute that he participated in procuring the warrant by discussing the investigation with Durand who then obtained the warrant. And Washington cannot prove—nor does she argue—that the warrant was facially invalid because it was materially irregular, was issued by a court without jurisdiction, or did not purport to authorize her detention. With respect to obtaining the warrant, Washington's counsel conceded at oral argument that

neither Howard nor Durand lied to the magistrate. Washington also makes no argument that there were material omissions or that it was unreasonable for Howard to believe that there was probable cause at the time Durand applied for the warrant. And it is of no moment that she was later exonerated. *See United States v. Martinez-Fuerte*, 428 U.S. 543, 565 (1976) ("One . . . purpose [of the warrant requirement] is to prevent hindsight from coloring the evaluation of the reasonableness of a . . . seizure."); *United States v. Robinson*, 535 F.2d 881, 884 (5th Cir. 1976) ("The Fourth Amendment does not have that special feature known as hindsight.").

The well-settled common-law principles that governed the tort of malicious prosecution in 1871 when Congress enacted section 1983 and that "guide" us further support our conclusion. *See Manuel*, 137 S. Ct. at 921. At common law, for the tort of malicious prosecution, an officer who detained an individual pursuant to a warrant—with a few exceptions—had a complete defense to liability for the arrest and detention. MARTIN L. NEWELL, A TREATISE ON THE LAW OF MALICIOUS PROSECUTION, FALSE IMPRISONMENT, AND THE ABUSE OF LEGAL PROCESS ch. XII, § 5, at 431–32 (Chi., Callaghan & Co. 1892) (quoting verbatim from *Justification*, 2 JOHN BOUVIER, A LAW DICTIONARY, ADAPTED TO THE CONSTITUTION AND LAWS OF THE UNITED STATES OF AMERICA, AND OF THE SEVERAL STATES OF THE AMERICAN UNION (Phila., J. B. Lippincott & Co. 15th ed. 1883)). So, unless an accused could prove that one of the exceptions applied, the warrant that caused his detention served as "a complete bar to the action." *See Justification*, 1 JOHN BOUVIER, A

LAW DICTIONARY, ADAPTED TO THE CONSTITUTION AND LAWS OF THE UNITED STATES OF AMERICA, AND OF THE SEVERAL STATES OF THE AMERICAN UNION (Phila., George W. Childs 11th ed. 1862).

In 1871, obtaining a warrant to arrest a suspect was "the proper course when the circumstances of the case . . . permit[ted]." *See Arrest, id.* At common law, a warrant protected an officer from liability even if the warrant was actually void, incorrectly issued, or based on an erroneous judgment. NEWELL, *supra*, ch. XII, § 5(1), at 432–33; *Miller v. Brown*, 3 Mo. 127, 130 (1832) ("[W]here the Court . . . [has] jurisdiction of the subject matter, the . . . officer is not bound to examine into the validity of the judgment, proceedings or process . . . ."); *see also Brown v. Crowl*, 5 Wend. 298, 299–301 (N.Y. Sup. Ct. 1830) (explaining that a warrant founded upon an erroneous judgment was still valid such that a claim for false imprisonment did not lie); *Anderson v. Friend*, 85 Ill. 135, 137 (1877) (concluding that a prosecutor had a justification because he obtained independent legal advice about whether he had probable cause to institute the action, even though the witnesses later changed their testimony). But arrests based on warrants that were intrinsically invalid "render[ed] the officer liable for a trespass to the party arrested." *Arrest*, 1 JOHN BOUVIER, A LAW DICTIONARY, ADAPTED TO THE CONSTITUTION AND LAWS OF THE UNITED STATES OF AMERICA, AND OF THE SEVERAL STATES OF THE AMERICAN UNION (Phila., J. B. Lippincott & Co. 14th ed. 1878). And a warrant was only intrinsically invalid if it was "materially irregular" or facially void, if it was apparent from the warrant that the court "ha[d] no

general jurisdiction of the subject-matter," or if the officer's actions extended beyond the scope of the warrant. *Id.*; *see also Justification*, *id.*; NEWELL, *supra*, ch. XII, § 5, at 432.

To be sure, at common law, an officer could also be liable for an arrest pursuant to a warrant if the officer unlawfully obtained the warrant. *See* 2 C. G. ADDISON, A TREATISE ON THE LAW OF TORTS ch. XII, § 856, at 74 (H.G. Wood ed., Jersey City, Frederick D. Linn & Co. 1881) ("If [an individual] maliciously and without reasonable and probable cause has . . . induced [a] magistrate to issue a warrant against [another], [that person] is responsible in damages in an action for malicious prosecution."). That is, one who obtained a warrant might be liable if he "willfully" or recklessly made misstatements or omissions to support the warrant application. *See id.* ch. XIII, § 856, at 74–75 (explaining that an action malicious prosecution might lie if "the charge was willfully false, . . . untrue to his knowledge at the time[,] . . . or were of such a nature that no well-intentioned person would state" it without further investigation); *cf. Honeycut v. Freeman*, 35 N.C. (13 Ired.) 320, 324 (1852) (a person who attempts to shield himself from liability by asserting that he relied on the advice of counsel must disclose all material facts to his attorney); MELVILLE M. BIGELOW, ELEMENTS OF THE LAW OF TORTS FOR THE USE OF STUDENTS ch. III, § 3, at 84–85 (Bos., Little, Brown, & Co. 1878) ("[T]o establish probable cause" through "the defence of [acting on the] advice of legal counsel, . . . the statement made . . . to his counsel must be full and true . . . ."); *Fitzjohn v. Mackinder* (1861) 142 Eng. Rep. 199, 208 (opinion of

Cockburn, J.) (explaining that a judicial order to prosecute another person does not protect the prosecutor if the order was obtained maliciously).

An officer might also be liable if he should have known that the information provided to the magistrate failed to establish probable cause. *See Elsee*, 1 Dowl. & Ry. at 104 (opinion of Bayley, J.) (explaining that when a person "makes the charge, and he prevails upon the justice to issue [the] warrant, . . . he has no right to say" as a defense to a suit for malicious prosecution that the "warrant is improperly granted"). But because a neutral magistrate's determination that there is probable cause "affords *prima facie* evidence of probable cause," the accused bore the burden of proving the lack of probable cause. *See* BIGELOW, *supra*, ch. III, § 3, at 81 (explaining that a magistrate's probable cause determination is sufficient to require the accused to produce affirmative evidence of the lack of probable cause).

To be liable for malicious prosecution at common law, the prosecutor need not have personally obtained the warrant from the magistrate. It was enough that he "set[] the machinery of the law in motion . . . whether he [did] the act himself or procure[d] another to do it." NEWELL, *supra*, ch. X, § 4, at 367. He "need not [have] participate[d] in the execution of the prosecution . . . if he ma[de] out the affidavit maliciously, vexatiously and without probable cause" even in the absence of "further intervention on his part." *Id.* ch. X, § 4, at 368.

Here, because Howard both procured the warrant and detained Washington pursuant to it, he was justified in detaining her based on that warrant unless it was facially invalid or procured unlawfully. It was neither. Because Howard was entitled to rely on the warrant, Washington cannot prove that Howard "violated her Fourth Amendment right to be free from seizures pursuant to legal process." *Luke*, 975 F.3d at 1144. And this reason provides another separate ground for affirming the summary judgment in Howard's favor.

### C. *Washington Cannot Prove that Howard Affirmatively Acted to Continue Her Prosecution.*

Washington's argument turns on a supposed affirmative duty for any investigator to return to the magistrate every time exculpatory evidence comes to light. Washington cannot prove and does not allege that Howard took affirmative steps to continue the prosecution. Instead, Washington alleges that Howard violated her Fourth Amendment right because he continued to detain her pursuant to a warrant and to investigate the crime after probable cause had dissipated. She contends that Howard should have returned to the magistrate with the new information and requested that the warrant be rescinded. We disagree.

The Fourth Amendment imposes no affirmative duty on an investigator to return to the magistrate after every twist and turn of the investigation. *See Brady v. Dill*, 187 F.3d 104, 111–12 (1st Cir. 1999) (explaining that the "separation of functions" empowers "the prosecutor to decide whether to go forward" with the prosecution

and "the judicial branch" to ascertain "guilt or innocence"); *see also Baker*, 443 U.S. at 144 (explaining that when an officer makes an arrest pursuant to a lawful warrant but due to mistaken identity arrests a person for whose detainment there is no probable cause, the accused can invoke his right to a speedy trial); *id.* at 145 ("A reasonable division of functions between law enforcement officers, committing magistrates, and judicial officers . . . is entirely consistent with 'due process of law.'"). Instead, the officer is allowed to defer to the prosecutor, who has the power to determine whether to proceed with the prosecution and whether to seek continued pretrial detention based on the evidence collected. At least two of our sister circuits have rejected arguments similar to Washington's. *See Brady*, 187 F.3d at 111–12; *Brooks*, 85 F.3d at 184; *see also Wilson v. Russo*, 212 F.3d 781, 792 (3d Cir. 2000) (explaining that the "law in this area is not entirely settled" but only because a duty might arise in the context of *warrantless* arrests).

To be sure, a police officer cannot intentionally or recklessly make material misstatements or omissions in later testimony to continue detention, such as at an arraignment, indictment, or bond hearing. *See Manuel*, 137 S. Ct. at 920 n.8 (explaining that fabricated evidence can result in a Fourth Amendment violation "[w]hatever [the] precise form . . . [of] the proceeding"). And an officer's failure to disclose exculpatory evidence to the prosecutor might violate the Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady v. Maryland*, 373 U.S. 83 (1963). *McMillian v. Johnson*, 88 F.3d 1554, 1567 (11th Cir.) ("Investigators

satisfy their obligations under *Brady* when they turn exculpatory and impeachment evidence over to the prosecutor."), *amended on other grounds*, 101 F.3d 1363 (11th Cir. 1996); *Moldowan v. City of Warren*, 578 F.3d 351, 378, 381 (6th Cir. 2009) (collecting cases from the First, Second, Fifth, Seventh, Eighth, and Eleventh Circuits, and reaching the same conclusion); *see also Youngblood v. West Virginia*, 547 U.S. 867, 868–70 (2006) (concluding that an investigator's instruction to another person to discard exculpatory evidence was a potential *Brady* violation). But neither of these constitutional requirements impose on investigators a duty to return to the magistrate after discovering exculpatory evidence.

Because well-settled principles that governed the common-law tort of malicious prosecution when Congress enacted section 1983 in 1871 "guide" us, *Manuel*, 137 S. Ct. at 921, we add that our conclusion—that the Fourth Amendment requires an affirmative act to continue the prosecution—is supported by a similar requirement at common law. At common law, courts focused primarily on the initiation of a prosecution as the act giving rise to liability for malicious prosecution. A plaintiff had to prove that the information available and known to the "prosecutor" at the institution of the proceeding did not provide probable cause. *See* 1 FRANCIS HILLIARD, LAW OF TORTS OR PRIVATE WRONGS ch. XVI, § 17, at 451 (Bos. Little, Brown & Co. 4th ed. 1874) ("[T]hose facts and circumstances which were known to the prosecutor at the time he instituted the prosecution are to be alone considered, in determining the question of probable cause."). Conversely, if the prosecutor had

probable cause to initiate the prosecution based on the information then known to him, and information exculpating the accused later came to the prosecutor's attention, the accused could not sustain an action for malicious prosecution based on the initiation of the action. *See id.* ch. XVI, § 19(b), at 455–56.

To be sure, if, after discovering exculpatory information, the prosecutor continued to prosecute the action, the defendant could, in some circumstances, maintain an action for malicious prosecution. *See id.* ch. XVI, § 13, at 446–47 ("The question sometimes arises, whether an action will lie for the malicious *continuance* of a prosecution, which was lawfully commenced."). For example, an English decision explained that "a prosecution, though in the outset not malicious, . . . may nevertheless become malicious in any of the stages through which it has to pass, if the prosecutor, having acquired positive knowledge of the innocence of the accused, perseveres *malo animo* [with malicious intent] in the prosecution, with the intention of procuring *per nefas* [through a wrongful act] a conviction of the accused." *Fitzjohn*, 142 Eng. Rep. at 209 (opinion of Cockburn, C.J.) (italics added). Although it is unclear whether this principle had been adopted in the United States in 1871, *see* 1 HILLIARD, *supra*, ch. XVI., § 13, at 446–47 (collecting principally English decisions for this principle), we have held, in any event, that "a criminal prosecution . . . continued . . . with malice and without probable cause" can violate the Fourth Amendment, *Wood v. Kesler*, 323 F.3d 872, 882 (11th Cir. 2003).

Although taking affirmative steps to further a prosecution was actionable, *see Fitzjohn*, 142 Eng. Rep. at 209 (opinion of Cockburn, J.) (explaining that a prosecution may "become malicious in any of the stages through which it has to pass"), later inaction alone was probably insufficient to prove a malicious prosecution. And there was certainly no "well[-]settled" principle, *Nieves v. Bartlett*, 139 S. Ct. 1715, 1726 (2019) (internal quotation marks omitted), that later inaction could give rise to liability.

Consider, for example, two leading English decisions from the early and middle nineteenth century—both cited by a respected American treatise as authoritative, *see* 1 HILLIARD, *supra*, ch. XVI, § 13, at 447,—that evidence the need for proof of an affirmative act that continued the prosecution. In the first decision, *Page v. Wiple*, a creditor procured a writ for the arrest of a debtor for the nonpayment of a debt owed. (1803) 102 Eng. Rep. 618, 618. The debtor, who was unaware of the outstanding writ, later paid the creditor in full, including costs. *Id.* at 618–19. The creditor did not inform the debtor of the outstanding writ or move to countermand it. *Id.* The debtor was then arrested on the writ and sued the creditor for the damages that resulted from his arrest. *Id.* at 618. In rejecting the debtor's action, the court explained that it was not "the [creditor's] duty . . . to prevent the arrest," and that the creditor did not "wilful[ly]" or "vexatiously" suffer the debtor to be arrested. *Id.* at 619. Indeed, the debtor did not allege anything that "ha[d] been done by the [creditor], . . . but a mere nonfeazance." *Id.*; *see also Scheibel v. Fairbain* (1799) 126 Eng. Rep. 968, 970 (opinion of Buller, J.)

(refusing to hold a creditor liable "for mere non-feasance" unless the creditor made an undertaking that would make him liable in contract for failing to countermand the writ).

By contrast, in *Churchill v. Siggers*, a creditor was liable for issuing a warrant for the full sum *after* receiving partial payment by another debtor. (1854) 118 Eng. Rep. 1389, 1392. In *Churchill*, a creditor brought two separate actions for the recovery of a debt because multiple parties were liable for the same debt. *Id.* at 1390. The creditor obtained a favorable judgment in both actions and attempted to collect on the amount. *Id.* Eventually, one of the debtors paid the full principal and the costs the creditor incurred in that action; the other debtor still owed the costs incurred in the separate action. *Id.* The creditor then procured a writ to arrest the remaining debtor for the full amount of the debt and the costs from both actions, pursuant to which the debtor was arrested and detained for four weeks. *Id.* The court held that the creditor was liable for procuring the writ "maliciously and without any reasonable or probable cause" with a "motive . . . to oppress and injure the debtor" because the creditor knew the debt had been paid when he procured the writ. *Id.* at 1392. Even though the creditor's collection efforts had been ongoing, it was not until he procured the writ—a stage in the legal process—that liability attached. *See id.* (concluding that the creditor was liable for "put[ting] into force the process of law").

The understanding of what constituted "continuing a prosecution" in 1871 also supports an affirmative-act requirement. A

criminal prosecution was defined as "[t]he means adopted to bring a supposed offender to justice and punishment by due course of law." *Prosecution,* 2 BOUVIER (14th ed.), *supra*. And the "means adopted" meant, in this context, "[t]hat which is used in order to an end" or the "instrument" adopted. *Mean*, JOSEPH E. WORCESTER, A DICTIONARY OF THE ENGLISH LANGUAGE (London, Frederick Warne & Co. new ed. 1884); *see also Mean*, WILLIAM G. WEBSTER & WILLIAM A. WHEELER, A DICTIONARY OF THE ENGLISH LANGUAGE, EXPLANATORY, PRONOUNCING, ETYMOLOGICAL, AND SYNONYMOUS (N.Y.C. & Chi., Ivison, Blakeman, Taylor & Co. 1881) ("Intermediate agency or measure; instrument."). So, a prosecution was the instrument used to pursue punishment through the due course of law. And to continue it meant to take action in pursuit of that instrument, not to set it aside.

If inaction had sufficed to continue a prosecution, then it would have been nonsensical to say that a litigant who had initiated an action had then "omi[tted] to prosecute [that] action." *See Burhans v. Sanford*, 19 Wend. 417, 418 (N.Y. Sup. Ct. 1838). But the phrases, "want of prosecution" and "omit," "neglect," or "fail to prosecute," in the middle of the nineteenth century commonly referred to the failure to take any affirmative act in the prosecution. *See, e.g., Hammond v. Will*, 60 Ill. 404, 408 (1871) (citing *Gorton v. DeAngelis*, 6 Wend. 418, 420–21 (N.Y. Sup. Ct. 1831), approvingly for the proposition that "mere neglect to prosecute a suit commenced" is not evidence of a want of probable cause); *Dailey v. Wynn*, 33 Tex. 614, 617 (1870) (discussing the effect of a creditor

"omit[ting] to prosecute [a suit] brought"); *State v. Phillips*, 36 Mo. 149, 149 (1865) (dismissing an appeal when "the appellant ha[d] failed to prosecute her appeal"); *Harter v. Johnson*, 16 Ind. 271, 272 (1861) (affirming a judgment because a statute that allowed third parties to bring suit against the father for maintenance of the child when the mother "commences a suit and fails to prosecute the same to final judgment" had been repealed); *Karth v. Light*, 15 Cal. 324, 327 (1860) (explaining that a dismissal of an appeal for "mere neglect to prosecute" operated as an affirmance); *Hughes v. Lane*, 25 Tex. 356, 367 (1860) (discussing approvingly the practice of dismissing an appeal for "failure to prosecute"), *overruled on other grounds by Bomar v. Parker*, 4 S.W. 599, 606 (Tex. 1887); *Furber v. Carter*, 34 Tenn. (2 Sneed) 1, 3–4 (1854) (discussing the effect of a "failure to prosecute" an "appeal in error"); BIGELOW, *supra*, ch. III, § 3, at 82–83 ("The mere omission . . . to appear and prosecute a civil action . . . is no evidence of a want of probable cause.").

Further, a litigant's "failure . . . to prosecute"—that is, his failure to take an affirmative act to pursue the prosecution—had legal consequences. *Green v. Doane*, 1 Cal. Unrep. 86, 86 (1860). For example, it was a ground for dismissing a civil action or denying a motion. *E.g.*, *Smith v. Whiting*, 100 Mass. 122, 123 (1868) ("fail[ure] to prosecute" a writ of replevin entitled the defendant to nominal damages); *Sherrerd v. Frazer*, 6 Minn. 572, 574 (1861) (quoting *Deuel v. Hawke*, 2 Minn. 50, 54 (1858)) ("[I]f [the plaintiff] neglects to prosecute unreasonably, the Defendant may have an order of dismissal . . . ."); *Green*, 1 Cal. Unrep. at 86 (explaining that

a motion for new trial was denied for "failure . . . to prosecute"); *Johnson's Adm'rs v. Ward*, 23 Tex. 628, 630 (1859) (discussing when "neglect . . . to appear and prosecute" would warrant dismissal); *Aubrey v. Almy*, 4 Ohio St. 524, 528 (1855) (discussing a statute directing courts to "render judgment" with "costs" for the defendant if the plaintiff "shall fail or neglect to prosecute the said suit to final judgment"); *Farrin v. Kennebec & Portland R.R. Co.*, 36 Me. 34, 36 (1853) (affirming a dismissal for "neglect to prosecute the action"); *Burhans*, 19 Wend. at 418 (noting that an "omission to prosecute" is ground for "obtain[ing] a judgment"); *Pinner v. Edwards*, 27 Va. (6 Rand.) 675, 677 (1828) (differentiating between a dismissal for "a voluntary failure to prosecute," for which a state statute awarded the defendant five dollars, and a dismissal because the plaintiff could not afford "to give a security for costs"); *Morgan v. Currie*, 10 Ky. (3 A.K. Marsh) 293, 293 (1821) (affirming a dismissal and judgment for costs for "failing to prosecute the[] suit"); *see also Cohn v. Borchard Affiliations*, 250 N.E.2d 690, 695 (N.Y. 1969) (discussing the development of dismissing civil actions for "failure to prosecute").

This understanding remained the same in the criminal context. *Cf.* FED. R. CRIM. P. 48(b) & advisory committee's note b (1944) ("[T]he court may dismiss" the case "if there is unnecessary delay." "This rule is a restatement of the inherent power of the court to dismiss a case for want of prosecution. *Ex parte Altman*, 34 F. Supp. 106 (S.D. Cal. 1940)."). For example, in New York in 1850, the Commissioners on Practice and Pleading recommended

giving criminal courts the inherent power to dismiss a criminal action "For Want of Prosecution." *People v. Douglass*, 456 N.E.2d 1179, 1183 (N.Y. 1983) (quoting Commissioners' Report on Code of Criminal Procedure (1850), ch. VII, p. 341 (explaining that through inaction, "the indictment may be kept forever suspended over the head of the defendant" and that "[t]he only remedy he can obtain . . . [for] inexcusable neglect to bring him to trial, is by an order of the court, discharging him either upon bail or upon his own recognizance")). And there could be no "[w]ant of [p]rosecution" by inaction if inaction sufficed to continue the prosecution.

Caselaw from the middle of the nineteenth century and contemporaneous treatises confirm that this understanding of "prosecute" subsisted in the context of malicious prosecution. *See, e.g.*, *Williams v. Vanmeter*, 8 Mo. 339, 341 (1844) ("The *conduct* of the defendant gives the cause of action." (emphasis added)); *see also James v. Phelps* (1840) 113 Eng. Rep. 499, 501 (opinion of Coleridge, J., dissenting) (citing *Delegal v. Highly* (1837) 132 Eng. Rep. 677, for the proposition that probable cause must exist in the mind of the plaintiff "at the time of the *act* in question" (emphasis added)); For example, a prosecutor's acts in "caus[ing] a search warrant to issue," "lodging a complaint or information," and "obtaining a warrant," were all actionable. 2 ADDISON, *supra*, ch. XIII, §§ 859, 878, at 77, 90 ("In all actions . . . for *going* before justices of the peace, and *lodging* a complaint or information . . . , and *obtaining* a warrant for his arrest, and *causing* him to be arrested, it must be proved that the . . . *acts* of the defendant . . . were done

maliciously, and without reasonable and probable cause." (emphases added)); *see also* 1 HILLIARD, *supra*, ch. XVI, § 19, at 454 (explaining that the probable cause determination is based on whether the prosecutor "had been informed of, or knew," the relevant facts "*at the time of the charge*"). In 1871, to "continue a prosecution" referred to taking an affirmative act to further it. And the common law made performing those affirmative acts with malice and without probable cause actionable.

Two nineteenth century decisions from the United States, *see Stone v. Swift*, 21 Mass. (6 Pick.) 389 (1828); *Mann v. Holbrook*, 20 Vt. 523 (1848), could be read to suggest that allowing a prosecution to continue to exist without acting was actionable. *See* 1 HILLIARD, *supra*, ch. XVI, §§ 13, 19(b), at 446–47, 456 (citing those two decisions). But neither is applicable. And even if they were, they could not establish a well-settled principle in the light of the weight of the evidence on the other side. *See Nieves*, 139 S. Ct. at 1726.

In the first, Stone brought an action for malicious prosecution against Swift for purchasing a writ of attachment against Stone's property despite knowing that he had no probable cause. *Stone*, 21 Mass. (6 Pick.) at 389–90. To support his claim, Stone offered as evidence that, after Swift caused a sheriff to execute the attachment, he consulted an attorney who told him that he had no basis for attaching Stone's property. *Id.* at 391. On appeal, the Supreme Judicial Court of Massachusetts explained that Stone needed to provide evidence that "Swift knew, when he commenced his

action, that he had no cause of action" because the plaintiff's declaration was "grounded upon" the commencement of the action. *Id.* at 393. But it also said that if the declaration had alleged that, after initiating the suit, Swift discovered that he did not have probable cause and nevertheless "continued his attachment maliciously . . . , it would have presented a very different inquiry." *Id.*

*Stone* does not undermine an affirmative-act requirement for three reasons. First, the opinion itself is unclear whether "continu[ing] his attachment" meant to allow the sheriff to continue to detain the property after having attached it or to cause the sheriff to execute the writ of attachment. *Id.* at 394; *see also id.* (recounting the background and differentiating between "attaching and detaining [the] property"); *see generally* 3 WILLIAM BLACKSTONE, COMMENTARIES *270–92 (explaining that an action was commenced by purchasing a writ and that afterwards an officer executed that writ by, for example, attaching property). Second, the statement was dictum—not an alternative holding—and did not explain what the "different inquiry" would have been. *See Stone*, 21 Mass. (6 Pick) at 394. And third, in 1828, the allegedly malicious prosecution might have been subject to different rules than a criminal prosecution or a civil action that resulted in an arrest because it was a civil action that did not result in bodily confinement. *Compare Adams v. Lisher*, 3 Blackf. 241, 244 (Ind. 1833) ("There is a distinction between malicious arrests in civil suits . . . and a malicious prosecution of an offence, misdemeanor, or wrong, which affects the public" because in criminal prosecutions "the prosecutor

is much more favoured."), *with Stewart v. Sonneborn*, 98 U.S. 187, 192 (1879) ("Notwithstanding what has been said in some decisions of a distinction between actions for criminal prosecutions and civil suits, both classes at the *present day* require substantially the same essentials." (emphasis added)), *and Collins v. Hayte*, 50 Ill. 353, 354 (1869) ("[A] civil suit . . . is governed by rules of law precisely the same" as those in a criminal suit.). So, even if a contrary principle could be derived from *Stone*, it is unclear how the principle would have applied to a criminal prosecution.

In the second decision, Holbrook had caused an officer to execute a writ of attachment against Mann's property, but he did not enter it to inform the magistrate of the litigation. *Mann*, 20 Vt. at 523–24. Mann prepared his defense and appeared for the trial, but neither Holbrook nor the magistrate—who was unaware of the matter because Holbrook never entered the writ—appeared. *Id.* The Supreme Court of Vermont concluded that Holbrook could be liable for the "expense and loss" Mann incurred in preparing for the trial. *Id.* at 524. But Mann did not bring a malicious prosecution action, so the court did not address the elements of that tort. *See id.* at 524, n.⋆ (citing *Griffin v. Farwell*, 20 Vt. 151 (1848)); *Griffin*, 20 Vt. at 153 (explaining that "the law has provided no other adequate remedy" in those circumstances). So, rather than requiring a lack of probable cause and malice, the court explained that Mann need only show Holbrook's "neglect of duty." *Id. Mann* does not undermine the requirement that, to continue a prosecution for the

purposes of malicious prosecution, one must have taken an affirmative action to advance the legal process.

To succeed on a Fourth Amendment claim for a seizure pursuant to legal process in this context, a plaintiff must prove that the officer took an affirmative act to continue the prosecution because an officer has no duty to "run after his [warrant]." *See Page*, 102 Eng. Rep. at 619. Washington cannot prove that Howard took an affirmative act to continue her seizure, so she cannot prove that Howard "violated [her] Fourth Amendment right." *See Luke*, 975 F.3d at 1144. This reason provides a separate ground for affirming the summary judgment in Howard's favor.

## IV. CONCLUSION

We **AFFIRM** the summary judgment in favor of Howard.