[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-12493

_____

GEORGE ANGEL HARRIS,

Plaintiff-Appellant,

*versus*

JON HIXON,
of the Richmond County Sheriff's Office,
in his individual capacity,
JOSEPH BULTMAN,
of the Columbia County Sheriff's Office,
in his individual capacity,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 1:20-cv-00147-JRH-BKE

_____

Before GRANT, TJOFLAT, and ED CARNES, Circuit Judges.

ED CARNES, Circuit Judge:

This is a case of mistaken identification. While investigating the use of a stolen debit card, sheriff's office investigators Joseph Bultman and Jon Hixon reviewed security camera footage that showed a man making purchases with the stolen card. The investigators identified him as George Angel Harris, and Hixon obtained two warrants for his arrest for financial transaction card fraud. Harris was later arrested on the warrants and held in jail for "[a] few hours" (those are his words from his deposition). A nolle prosequi order was eventually entered, and the criminal case against him was dismissed.

Harris filed a 42 U.S.C. § 1983 lawsuit against the two investigators. His complaint claimed that they had violated his Fourth Amendment rights by "causing [him] to be falsely arrested, unlawfully detained, and subjected to prosecution without probable cause." It alleged that Investigator Hixon had obtained the warrants for his arrest without probable cause. Because Harris' arrest was warrant-based, the district court construed his § 1983 Fourth Amendment claims as ones for malicious prosecution. After excluding from consideration the testimony of Harris' proffered

expert on law enforcement procedures and standards, the court granted summary judgment in favor of the investigators on qualified immunity grounds.

Harris contends that the investigation leading to his arrest was so inadequate that it caused him to be arrested without probable cause in violation of his Fourth Amendment rights, and that the district court abused its discretion in excluding his expert's testimony about the unreasonableness of the investigation. He also contends that Hixon's arrest affidavit was based on conclusory statements without any supporting facts, making the warrants for his arrest constitutionally inadequate.

## I. BACKGROUND FACTS AND PROCEDURAL HISTORY

It all began on January 9, 2019, when someone broke into a car and stole a debit card and other items. The case was assigned to Columbia County Sheriff's Investigator Joseph Bultman. His case report documents the steps he took in his investigation, which led to the arrest of Harris. Bultman began his investigation by speaking to the crime victim. He learned from him that someone was using the stolen debit card to make purchases. Bultman contacted the victim's bank to get records showing when and where the stolen debit card had been used. By reviewing the debit card transaction details from the bank records, Bultman learned that the card had been used at two Redbox DVD rental kiosks and at two gas stations, all of which were located in a different county from where the car break-in had occurred.

Bultman went to the Redbox locations and the gas stations where the stolen debit card had been used, and he viewed security camera footage from there. The video footage from the two gas pumps provided no leads. But the footage from the two Redbox recordings showed a person using the stolen debit card. He described that person in his report as "a light skinned male with dreads that appeared to be tied up on the top of his head." Bultman also discovered that the times the Redbox security footage showed the suspect using the stolen debit card matched the times "the financial institution transaction sheet" showed the card had been used at the Redbox locations.

Bultman thought that he recognized the person he saw on the video footage using the stolen debit card at the Redbox locations. He believed it was George Harris, a person he had encountered before in the course of his law enforcement duties. In 2015, there was a fight at a McDonald's restaurant, and Bultman had arrested Harris for obstructing a law enforcement officer. Harris had pleaded guilty to that crime and had been sentenced to 12 months probation. Sometime thereafter, but before the 2019 investigation in this case (Bultman could not remember exactly when), he had encountered Harris again during a domestic dispute between Harris and his girlfriend. During those two encounters, Bultman had spent a total of an hour to an hour-and-a-half with Harris.

In an effort to confirm that he had correctly identified the person using the stolen card at the Redbox machines, Bultman compared earlier mugshot photos of Harris from previous

bookings at a local county detention center and a Facebook photo of him that was available online with the man shown in the Redbox security camera footage. After doing that, Bultman had no doubt that Harris was the person who had used the stolen card at the Redbox machines.

But that is not all Bultman did. He also tried to locate footage from security cameras near the fitness center where the break-in had taken place, but he could not find any cameras near there. He also unsuccessfully attempted to contact Harris at his last known address so he could interview him. All told, Bultman investigated the case over a period of nearly a month.

After doing so, Bultman met with Investigator Hixon of the Sheriff's Office in Richmond County, which was the county where the stolen debit card had been used. Bultman presented Hixon with the evidence he had gathered during his investigation. He told Hixon that he had interacted with Harris before and was confident that he was the person the security camera recordings showed using the stolen debit card at the Redbox machines.

Investigator Hixon "pulled old mugshots" of Harris. Along with Bultman and three other officers, he compared the earlier mugshots of Harris and his Facebook photograph with the image the video footage showed of the man using the stolen card at the Redbox. All five officers believed that Harris was the man using the stolen card at the Redbox.

Hixon prepared an arrest warrant application charging Harris with two counts of "financial transaction card fraud." Hixon swore to these facts as establishing probable cause to arrest Harris:

> On January 9, 2019, between 2200 and 2300 hours, Jacob Newman reported that his vehicle has been broken into at 3830 Washington Road, Suite 15, Martinez, GA. New[]man further stated that his financial transaction card was stolen during this incident (card number [redacted] from SRP Federal Credit Union). After this incident occurred, two separate transactions were caught on video at the Red Box, located at the Circle K, 2702 Wrightsboro Road, where the card was used f[or] a purchase of $3.24 on January 10, 2019, and the Red Box, located at Walgreens, 3228 Wrightsboro Road, where the card wa[s] used for a purchase of $3.78 on January 10, 2019. These transactions were caught on video tape by the respective businesses and the person making these transactions was identified as George Angel Harris.

The warrant application described the identification in the passive voice: the Redbox suspect "was identified" as Harris. It contained none of the details about the steps in Bultman's and Hixon's investigations that led them to identify Harris as the Redbox suspect. Nonetheless, a judicial officer found probable cause and issued two warrants for Harris' arrest for financial transaction card fraud. There was one warrant each for the two uses of the stolen card, resulting in two charges of financial transaction card fraud.

About six weeks after the two warrants were issued, Harris was a passenger in a car that was involved in an accident in Richmond County, where Hixon had sworn out the warrants. The officer who responded to the accident checked IDs, ran a criminal history check, and discovered the outstanding warrants. Harris was arrested on those warrants and taken to the county jail; he was released on bond a few hours later.

The county district attorney formally charged Harris with two counts of financial transaction card fraud, both of which were later nolle prossed. It turns out that Harris was not the person who was shown in the Redbox security video recordings using the stolen debit card after all. He sued the two investigators claiming that they had violated his Fourth Amendment rights.

## II. DISCUSSION

Harris contends that his Fourth Amendment rights were violated because Bultman's and Hixon's investigation to determine whether he was the Redbox suspect using the stolen debit card was inadequate. And he challenges the district court's decision to exclude the proffered testimony of his expert, which he says would help him show a jury that the investigation was "unreasonable." He also contends that the warrants for his arrest were constitutionally inadequate. Bultman and Hixon respond that they are entitled to qualified immunity.

A.  Bultman and Hixon Did Not Violate Harris' Fourth
     Amendment Rights Because Their Investigation
     Was Not Constitutionally Inadequate and
     They Had Probable Cause to Arrest Him

None of us is perfect.  "Because it is a document designed to govern imperfect people, the Constitution does not demand perfect trials." *United States v. Roy*, 855 F.3d 1133, 1135 (11th Cir. 2017). For the same reason, the Fourth Amendment does not require a perfect investigation before an arrest is made or a charge is brought. What it requires is a reasonable investigation within the bounds of what can be expected of imperfect people. As the text shows, the Constitution protects against "unreasonable searches and seizures," U.S. Const. amend. IV, not against imperfect searches and seizures.  That is why we have stated that "[t]he touchstone of the Fourth Amendment is reasonableness, and [why] we have stressed that in assessing whether officers acted reasonably it's not our role to armchair quarterback the officers' decision."  *Davis v. City of Apopka*, 78 F.4th 1326, 1337 (11th Cir. 2023) (citations and quotation marks omitted).

"Probable cause renders a seizure pursuant to legal process reasonable under the Fourth Amendment." *Washington v. Howard*, 25 F.4th 891, 898 (11th Cir. 2022).  And the Supreme Court has reminded us that, "Probable cause is not a high bar." *District of Columbia v. Wesby,* 583 U.S. 48, 57 (2018) (quotation marks omitted); *accord Kaley v. United States*, 571 U.S. 320, 338 (2014)*; Davis*, 78 F.4th at 1334.  As we held in *Davis* last year, probable cause does not require proof beyond a reasonable doubt or even proof by a

preponderance of the evidence that the person arrested for a crime is guilty. 78 F.4th at 1334.

Instead, probable cause exists if the totality of the circumstances could persuade a reasonable officer that there is a "substantial chance of criminal activity by the person who is arrested." *Id.* at 1334 (quotation marks omitted). "A substantial chance is all that is required, not an actual showing of such activity." *Id.* at 1335 (quotation marks omitted); *see also Washington*, 25 F.4th at 902 (holding that the correct standard to evaluate whether an officer had probable cause to arrest a suspect is to "ask whether a reasonable officer *could* conclude that there was a substantial chance of criminal activity") (alteration adopted) (quotation marks omitted) (emphasis added).

The charges against Harris were ultimately dismissed, but that does not negate the existence of probable cause at the time of his arrest. *Davis,* 78 F.4th at 1326 ("After all, probable cause can survive an acquittal."); *Baker v. McCollan*, 443 U.S. 137, 145 (1979) ("The Constitution does not guarantee that only the guilty will be arrested."); *Gates v. Khokhar*, 884 F.3d 1290, 1298 (11th Cir. 2018) (same).

The decision in *Hill v. California*, 401 U.S. 797 (1971), is instructive. Officers believed that a man was the suspect they had been looking for. *Id.* at 799. He protested that he was not that man and produced identification showing that he was not. *Id.* As the Supreme Court recounted it, "the police were unimpressed" and arrested him. *Id.* But "[t]hey were quite wrong as it turned out"

because he was not their man. *Id.* at 804. Still, the Court held that "the arrest [of the wrong man] and the subsequent search were reasonable and valid under the Fourth Amendment." *Id.* at 805. It explained that "sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment and on the record before [the Court] the officers' mistake was understandable and the arrest a reasonable response to the situation facing them at the time." *Id.* at 804; *see also Rodriguez v. Farrell*, 280 F.3d 1341, 1346–49 (11th Cir. 2002) (holding there is no Fourth Amendment violation when an officer misidentifies a suspect and arrests the wrong person based on a "reasonable mistake" when executing a warrant) (quotation marks omitted).

We've already detailed the steps that Officers Bultman and Hixon took in their investigation. *See supra* at 3–6. Those steps were reasonable ones to investigate both the car break-in and the use of the stolen debit card. Bultman went to the scenes of the crimes: the place where the car was broken into and the places where the stolen debit card was used. And he spoke with the crime victim. And he reviewed bank records detailing the use of the victim's stolen debit card. And he sought security camera video footage at the places where the stolen debit card was used. And he reviewed that video footage. And he relied on his familiarity with Harris, whom he had arrested on one occasion and encountered on another during a domestic violence call. And he confirmed his recollection of Harris' appearance by looking at an earlier mugshot of him. And he further confirmed the resemblance by looking at a Facebook photo of Harris. And he tried to locate Harris at his last

known address.  And, after he took all of those steps, he understandably, albeit mistakenly, concluded that he had identified the culprit.

Then Officer Bultman presented all of the evidence he had gathered to Investigator Hixon, who pulled some earlier mugshots of Harris.  Then Hixon, along with his supervisor, and Bultman, and two other officers — five officers in all — reviewed the evidence.  All five of them compared the earlier mugshots of Harris and his Facebook photograph with the images of the Redbox suspect shown on the security camera videos using the stolen debit card.  And all five officers agreed that Harris was the man at the Redbox when the stolen debit card was being used.  They were all mistaken as it turned out, but it was a reasonable mistake.

Perfection is not the Fourth Amendment standard for reasonableness.  *See Rodriguez*, 280 F.3d at 1348 (holding that when officers arrested the wrong person on a warrant for another person with a similar name and appearance, their "mistaken estimate of no more than five inches" in height difference did "not equal a constitutional violation").  In *Rushing v. Parker*, 599 F.3d 1263, 1265 (11th Cir. 2010), as in the present case, two officers misidentified a suspect.  A crime victim had identified the perpetrator as a man he had hired to repair hurricane damage to his roof.  *See id*. at 1265, 1268.  The victim filed a complaint against "Scott Rushing" and identified him in a photo line-up, but the "Scott Rushing" he picked out of the line-up was not the perpetrator.  *See id*. at 1268.  Later, when the case was handed over to a second officer, the investigative

file included exculpatory fingerprint evidence that apparently went unnoticed during the investigation. *See id.* But there was no evidence that the second officer, who filed an affidavit to obtain a warrant for Rushing's arrest, ever saw that fingerprint evidence. *See id.*

We concluded that even though the first officer's investigation was "by no means perfect," it "was not 'plainly incompetent.'" *Id.* (quoting *Kingsland v. City of Miami*, 382 F.3d 1220, 1231 (11th Cir. 2004)). And the second officer had only "limited involvement" in the investigation. *Id.* The state attorney's office had asked him to conduct a "photo-pack identification," and had given him a nineteen-page file that included the "fingerprint analysis, which may have exonerated" Rushing, but which he did not review. *Id.* at 1268–69. We concluded that the second officer's "failure to conduct a review of all evidence in the case was not unreasonable." *Id.* at 1269. There was no reason for him "to have questioned the thoroughness of the previous investigation." *Id.* We affirmed the grant of summary judgment for both officers on their qualified immunity defense. *See id.*

Just as those officers did, Bultman and Hixon misidentified a suspect. Just as in *Rushing*, that misidentification was "a reasonable mistake in the legitimate performance of [their] duties." *Id.* at 1267. And just as in *Rushing*, Hixon reasonably relied on Bultman's investigation because he had no reason to question the thoroughness of it. *See id.* at 1269.

Harris insists, however, that the two investigators failed to conduct a reasonable investigation into "readily discoverable facts."

He does not specify the facts they should have discovered but apparently means facts supporting the conclusion that he did not commit the crimes for which he was arrested. Harris asserts that those facts could have been obtained: by interviewing him; by determining where he was when "the crime" was committed (he doesn't specify whether he means the car break-in or the fraudulent use of the stolen debit card); and by looking for what he describes as "contemporaneous" photos of him online or elsewhere.

In his critique, Harris doesn't mention that Investigator Bultman went to Harris' last known address in an effort to interview him but couldn't find him. Harris doesn't mention that Bultman looked for cameras near the fitness center parking lot where the car break-in occurred but couldn't find any. And Harris doesn't mention the Facebook photo of him that the investigators did find and did consider and did compare to the security camera footage of the man using the stolen debit card at the Redbox machines.

Harris argues that other photographs of him, which he attached as exhibits to his response in opposition to the investigators' motion for summary judgment, show his lack of resemblance to the man using the stolen card at the Redbox machines. He points to the fact that in one of those other Facebook photos his hair is longer than the man's hair in the Redbox security camera footage. But there is no evidence that the investigators had or could have obtained that photo of Harris. And there is also no evidence about when that photo was taken; Harris does not say. So it doesn't prove

anything about what Harris looked like at the time the thief was using the stolen debit card at the Redbox machines.

Harris also points to a copy of a photo that was apparently taken *after* his arrest because it shows Harris posed by a Redbox machine to illustrate how his height differs from that of the man in the Redbox security video footage. But the investigators could not possibly have had a photo that wasn't in existence at the time they were investigating the crime. A photograph taken after an arrest provides no useful information about the photos investigators had (or *could have* turned up) before the arrest. Neither of the photos that Harris points to establishes anything of relevance to this case.

All of Harris' arguments about what the two investigators could or should have done to achieve a better or more thorough investigation are purely speculative and contrary to our precedent about what constitutes a reasonable (or an unreasonable) investigation under the Fourth Amendment. Harris relies on *Cozzi v. City of Birmingham*, 892 F.3d 1288 (11th Cir. 2018), *abrogated in part by Washington*, 25 F.4th at 899–900. But *Cozzi* applied a more demanding probable cause standard than our prior panel precedent and Supreme Court precedent require. *See Washington*, 25 F.4th at 899–901; *see also Garcia v. Casey*, 75 F.4th 1176, 1186 n.1 (11th Cir. 2023). And in any event, that case is nothing like this one.

In *Cozzi* the arresting officer had a crime scene photograph which established that the perpetrator had multiple tattoos "up and down his arm." 892 F.3d at 1292 (quotation marks omitted). The

officer showed that photo to the suspect's roommate, who noted the discrepancy and told the officer that the suspect had only one tattoo. *Id.* But the officer didn't even bother to look at the suspect's arm before arresting him. *Id.* The officer had "been given plainly exculpatory and easily verifiable information," as unambiguous and as visible as permanent ink (one tattoo instead of multiple ones up and down the arm). *Id.* at 1297. Few things are more easily verifiable than an arm covered with tattoos, and the evidence cannot be easily erased. But the arresting officer refused to look. *See id.* at 1292.

Harris has not pointed to any evidence that Bultman and Hixon had or were shown but refused to consider. *See id.* at 1297. He has not pointed to any readily available evidence that they knew about or were provided that would have plainly, obviously, and irrefutably exonerated him. Unlike the arresting officer in *Cozzi*, the investigators in this case were not "given plainly exculpatory and easily verifiable information" that they ignored. *Id.* Instead, Harris points to additional steps in the investigation that he thinks would have been useful for them to perform. His investigative suggestions are not evidence of a constitutional violation.

It is true that officers cannot unreasonably and knowingly disregard or ignore evidence or refuse to take an obvious investigative step that would readily establish that they lack probable cause to arrest a suspect. *See id.* at 1294. But in our decisions holding that officers have conducted constitutionally inadequate investigations and have arrested suspects without probable cause, the evidence

that they should have considered was not speculative and the possibility of gathering it was not aspirational. By contrast, the officers in those cases ignored:

> [C]oncrete evidence that obviously and definitively rules out probable cause: multiple tattoos on the perpetrator's arm, which the suspect did not have, *Cozzi* . . . , 892 F.3d [at] 1292–94 . . . ; documents showing authorization to be in a house, which conclusively established innocence, *Carter v. Butts Cnty.*, 821 F.3d 1310, 1320–21 (11th Cir. 2016); or a description of a marijuana-seller in her twenties while the person arrested was in her forties, coupled with the officer's own "serious doubts" that the person arrested was the perpetrator, *Tillman v. Coley*, 886 F.2d 317, 318–21 (11th Cir. 1989). *Accord Huebner* [*v. Bradshaw*], 935 F.3d [1183,] 1190 n.5 [(11th Cir. 2019)] (characterizing the tattoo evidence in *Cozzi* as "immediate and conclusive evidence that" the plaintiff was not the perpetrator).

*Davis*, 78 F.4th at 1343–44; *see also id.* at 1343 ("[E]ven where officers see or hear some exculpatory evidence, the fact that they still conclude probable cause exists does not mean they ignored or turned a blind eye or deaf ear to the exculpatory evidence. The probable cause determination depends on the totality of the evidence, inculpatory and exculpatory."); *Washington*, 25 F.4th at 902 (explaining that the arresting officer "was not required to believe [exculpatory evidence] or to weigh the evidence in such a way as to conclude that probable cause did not exist").

22-12493                Opinion of the Court                17

Harris has not pointed to any concrete evidence that the investigators disregarded or ignored. And they were not required to "take every conceivable step at whatever cost, to eliminate the possibility of convicting an innocent person." *Rankin v. Evans*, 133 F.3d 1425, 1436 (11th Cir. 1998) (cleaned up). As we have stressed, this Court will not "assume the role of Investigator-in-Chief and criticize the investigation [Bultman and Hixon] made, finding it wanting based on [Harris'] assertions that they should have done more or done it better." *Davis*, 78 F.4th at 1351. Harris' "invitation for us to post hoc superintend the investigation and accept his speculation about what might have been found runs directly contrary to binding precedent." *Id.* Bultman's and Hixon's investigations did not violate Harris' Fourth Amendment rights. *See id.*

### B. The Exclusion of Harris' Proffered Expert On Law Enforcement Investigations

Because binding precedent directs us to our conclusion about the reasonableness of Bultman's and Hixon's investigations, we don't need the opinion of Harris' proffered expert on law enforcement investigations. And neither did the district court. And neither would the jury if this case had gone to trial. As we will discuss now, the district court did not abuse its discretion by excluding that testimony.[1]

---

[1] Even though this case is here on appeal from the grant of summary judgment, instead of from a judgment after a trial, we address the expert opinion *Daubert* issue in terms of admissibility at trial. We do so because the admissibility of an expert's testimony is relevant, sometimes decisive, in

Investigator Bultman filed a *Daubert* motion seeking to exclude the testimony of Harris' proffered expert on law enforcement investigations, Timothy Williams. The parties don't dispute that Williams is qualified to testify as an expert on the subject, so we will assume that he is.[2]

The district court considered whether his testimony would be reliable and whether it would help or confuse a jury. The court focused on these "findings" from Williams' expert report:

> -[T]here was no investigation conducted by Investigator Bultman to forensically connect Mr. Harris to the vehicle and the theft of the debit card;

> -There was no investigation conducted by Investigator Hixon to establish the whereabouts of Mr. Harris during the theft of the debit card;

> -[Harris] was identified as the suspect . . . by a consensus of [Investigator Hixon's] colleagues absent any investigation to connect [Harris] to the crime. This type of investigation is very problematic in that it brings up the critical issue of cross ethnic

---

determining whether there is a genuine issue of material fact that will carry the case to trial, that is, whether a jury could have reasonably returned a verdict for the party who lost on summary judgment.

[2] Harris states that Williams, who is retired from the Los Angeles Police Department, has decades of experience as a police officer, investigator, trainer, and law enforcement executive and has testified as an expert in "dozens of civil cases around the country," focusing on police procedures and investigative techniques.

identification. The consensus of this identification . . . [was] made by all White individuals in an identification of a Black suspect. This type of investigation falls below law enforcement standards and could lead to a wrongful conviction. . . .

-Investigator Hixon had not taken any classes on photograph identification. . . . Without the requisite training, law enforcement personnel should not be assigned to an investigative assignment of any magnitude. . . . [Therefore], Investigator Hixon was not trained to be in the position he was then working and presently working. . . .

-[T]here was no investigation to ascertain if [Harris'] hair matched the hair of the suspect. . . . [T]his portion of the investigation fell/falls below law enforcement investigative standards.

-Failure to contact and interview [Harris] in this matter, fell/falls below law enforcement investigative standards.

-The Affidavits for the February 20, 2019 warrants are not accurate. . . . Seasoned investigative personnel are trained that arrest warrant information must be accurate. . . . A thorough and concise investigation was not completed in this case and fell/falls below law enforcement investigative standards.

The district court found that Williams' opinions were only conclusory statements that the investigations were inadequate. It determined that Williams had failed to "outline the basis of his opinions" and didn't explain what standards he was relying on as the basis for

his conclusion that the investigations fell "below law enforcement standards." And that his proffered testimony did not address how his experience would be reliably applied in this case beyond his own opinions that the defendants' investigations were insufficient. As a result, Williams' methodology was unreliable.

The court also found that Williams' testimony would not be helpful to a jury. His opinions were nothing more than what counsel could argue to the jury: that additional investigative steps should have been taken. The court explained that its "main concern" was that if the case went to a jury, the jurors would be misled to believe, based on Williams' testimony, that if additional investigative steps were not taken, there was a constitutional violation. The court pointed out: "That is not the proper legal standard, and the Fourth Amendment does not list out specific steps investigators must take in order to fulfill their investigative duty." The court also determined that a jury could decide for itself what to make of the photographs of Harris and the Redbox suspect and any resemblances or differences. For those reasons, the court granted Bultman's motion to exclude Williams' testimony.

Harris contends that the district court abused its discretion when it granted the motion to exclude Williams' testimony because it could have helped show a jury why Bultman's and Hixon's investigations were "unreasonable." We review only for an abuse of discretion the district court's decision to exclude Williams' expert testimony under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). *See Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1334 (11th

Cir. 2010). In applying that standard, "we defer to the district court's ruling unless it is manifestly erroneous." *Id.* (quotation marks omitted).

As the party offering Williams' expert testimony, Harris has the burden of establishing that the expert is qualified, his methodology is reliable, and his testimony will be helpful to the jury. *See United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc). We don't have to assess the first two elements because he loses on the last one. Because Harris has failed to show that Williams' testimony would help a trier of fact, the district court didn't abuse its discretion in excluding it, and the court certainly didn't commit any manifest error.

The bulk of Williams' proffered testimony was about legal standards for the court to assess and apply. Harris argues that "[j]ust as a doctor can testify about the standard of care," a law enforcement expert can testify based on his training and experience about what a reasonable investigator "would do to avoid arresting the wrong person." He asserts that the standard of care for law enforcement is to avoid arresting people without probable cause.

Neither this Court nor the district court requires an expert to tell us the standard for probable cause or to tell us how to instruct the jury about it. As we've already discussed, *see supra* at 8–9, the Supreme Court has instructed us on that, and we've followed those instructions: "Probable cause exists if the totality of the circumstances known to the officers could persuade a reasonable officer that there is a 'substantial chance of criminal activity' by the

person who is arrested." *Davis*, 78 F.4th at 1334 (quoting *Wesby*, 583 U.S. at 57). "A substantial chance is all that is required, not an actual showing of such activity." *Id.* at 1334–35 (quotation marks omitted); *see also Washington*, 25 F.4th at 902 (holding that the correct standard to evaluate whether an officer had probable cause to arrest a suspect is to "ask whether a reasonable officer could conclude that there was a substantial chance of criminal activity") (alteration adopted) (quoting *Wesby*, 583 U.S. at 61). And we know how to determine whether law enforcement officers' investigations are constitutionally adequate. *See, e.g.*, *Davis*, 78 F.4th at 1351; *Huebner*, 935 F.3d at 1190. The existence of probable cause and the constitutional adequacy of an investigation depend on legal standards that courts must apply.

The district court was right to be concerned Williams' testimony could mislead a jury into thinking that if additional investigative steps were not taken, there was a constitutional violation. As the court correctly pointed out, that is not the legal standard, and "the Fourth Amendment does not list out specific steps investigators must take in order to fulfill their investigative duty."

Harris also argues that his expert could help a jury understand that the identification of him as the thief using the debit card at the Redbox did not meet constitutional standards because all five officers who identified him are white, and he is not. He asserts that

Williams could testify about studies on cross-ethnic identification even though Williams himself is not an expert on that subject.[3]

Again, the district court properly exercised its discretion and its gatekeeping function when it determined that Williams' testimony would not be helpful to a jury. Expert testimony "generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Frazier*, 387 F.3d at 1262–63. The parties could have argued about whether the investigators' investigation was inadequate. They could have argued about whether the investigators misidentified Harris based on his photos and the video footage of the Redbox suspect. They could have argued Harris was of a different race, looked different from the suspect, and that a group of five white officers misidentified him.

Jurors don't need expert testimony to help them understand how Bultman and Hixon compared photographs or to compare photos for themselves. In *Prosper v. Martin*, 989 F.3d 1242, 1250 (11th Cir. 2021), we determined that "the jury [would] not need [plaintiff's proffered expert] to tell them what they could plainly see for themselves" in a video showing a struggle between an officer and the person he shot. Likewise, in this case a jury would not need expert testimony to determine what investigators Bultman and

---

[3] For whatever it's worth, Williams testified that Harris is biracial, by which he meant that one of Harris' parents is white and the other is black. In his deposition, Harris testified that he is Hispanic and that his mother is Costa Rican and his father his Puerto Rican.

Hixon did and how well they did it. A jury, like a judge, is fully capable of looking at all of the same images that the investigators did.

We have recognized that "it is difficult to persuade a court of appeals to reverse a district court's judgment on *Daubert* grounds," and "[t]he theme that shapes appellate review in this area is the limited nature of it." *United States v. Brown*, 415 F.3d 1257, 1264 (11th Cir. 2005). That theme is apt here. The district court didn't abuse its wide range of discretion in determining Harris failed to meet his burden to establish admissibility of proffered expert testimony from Williams.

C. Harris' § 1983 Malicious Prosecution Claim Against Hixon

Harris asserted a § 1983 claim against Investigator Hixon, contending that his warrant application was based on "bald conclusory statements" that Harris was identified as the person caught on video recordings using a stolen debit card at two Redbox locations. He claims that the insufficient warrant application violated his Fourth Amendment rights, which is considered a malicious prosecution claim. *See Williams v. Aguirre*, 965 F.3d 1147, 1158, 1165 (11th Cir. 2020) (explaining that a Fourth Amendment malicious prosecution violation "occurs when legal process itself goes wrong" such as when "the officer who applied for the warrant should have known that his application failed to establish probable cause") (quotation marks omitted).

As we have recounted, *see supra* a 6, Hixon's arrest warrant application stated that a suspect had been caught on video

recordings using a stolen debit card at two separate Redbox machines. The application stated, in the passive voice, that the suspect using the stolen debit card "was identified" as Harris. But it didn't recount any details about the steps that Bultman and Hixon took in their investigations and their basis for arriving at the reasonable conclusion that the suspect in the Redbox security video recordings was Harris. And there's no evidence that Hixon presented any information to the judicial officer other than what was in the application's sworn probable cause statement. Still, the judicial officer found probable cause, and Hixon obtained two warrants for Harris' arrest for financial transaction card fraud, one for each of the uses at the two separate Redbox locations.

1. The Warrants for Harris' Arrest and the Facts We Consider

To meet his burden on his malicious prosecution claim against Investigator Hixon, Harris must show "(1) that the legal process justifying his seizure was constitutionally infirm and (2) that his seizure would not otherwise be justified without legal process." *Williams*, 965 F.3d at 1165. Harris can establish that his arrest warrants were constitutionally infirm by showing either that Hixon "should have known that his [warrant] application failed to establish probable cause," or that Hixon "intentionally or recklessly made misstatements or omissions necessary to support the warrant." *Id.* Harris unsuccessfully attempts to make the first showing, contending that Hixon should have known his warrant application was insufficient to establish probable cause.

Here is why Harris' attempted showing falls short. There are differences between a § 1983 malicious prosecution claim arising from a warrant-based arrest and a § 1983 false arrest claim arising from a warrantless arrest. *See id.* at 1157–58. In *Williams* we explained that "warrantless arrests concern whether the facts known to the arresting officer establish probable cause." *Id.* at 1162–63. Warrant-based arrests, by contrast, require us to consider "whether the judicial officer who approved the seizure had sufficient information to find probable cause." *Id.* at 1163. In most, but not all, circumstances if the arrest affidavit doesn't independently establish probable cause, it "cannot be rehabilitated" by relying on information that the officer had but didn't disclose to the judicial officer when he sought the warrant. *Id.* at 1162 (quotation marks omitted).

In *Williams* we recognized that our decisions addressing § 1983 malicious prosecution claims haven't always followed the rule that the only information to be considered in determining if there was sufficient probable cause for issuance of an arrest warrant is the information that the judicial officer had, not any information that police officers kept to themselves. *See id.* at 1163. In that manner we have sometimes blurred the distinction between warrantless and warrant-based arrests. *See id.* To address that inconsistency, *Williams* applied our prior panel rule for resolving conflicts in our precedent and concluded that "our earliest decisions asked whether the judicial officer who made the probable-cause determination had sufficient, truthful information to establish

probable cause." *Id.* That is the law of the circuit, subject to one exception.

And that exception is an important one for purposes of this case. *Williams* "acknowledg[es] a limited role for the arresting officer's knowledge in considering the constitutionality of warrant-based seizures." *Id.* at 1164. That limited role exception provides that if the period of detention after arrest is brief, information known to the officers but not communicated to the judicial officer may be considered to uphold the seizure. *Id.* at 1162–63, 1164 ("Even if an arrest warrant is invalid, we have held that a seizure is still constitutional if it would be reasonable without a warrant," and the reasonableness of a warrantless arrest depends not only on whether the facts known or imputed to the officer establish probable cause but also on the brevity of the detention). While "this rule has little use in most suits challenging pretrial detention" because detentions after a warrant-based arrest usually are not brief, it does have a field of operation because some detentions are relatively brief. *See id.* If an officer who has probable cause to arrest can seize and detain a person without a warrant for a brief period of time, it makes sense that we can consider an officer's knowledge in seeking a warrant so long as the person arrested based on it is detained only for a brief time. *See id.* (adding that "only a 'brief period of detention'" is lawful without a valid form of legal process) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975)).

The *Williams* decision gives *Wood v. Kesler*, 323 F.3d 872 (11th Cir. 2003), as an example of precedent that allows us, when

assessing the constitutionality of a warrant-based arrest, to consider under certain limited circumstances not just the facts conveyed to the judicial officer in the arrest affidavit or otherwise, but also any additional facts known to the officers that were not communicated to the judge. *See Williams*, 965 F.3d at 1164. The detention facts in *Wood* align with those in the present case, bringing this case within the *Williams* exception too.

The facts in *Wood* are that when the plaintiff appeared in court to contest citations issued for speeding and logbook violations, he was issued a back-dated citation for reckless driving, and the arresting officer also obtained an arrest warrant for that charge. *See Wood*, 323 F.3d at 875–76. After the plaintiff refused to sign the reckless driving citation, he was arrested and held for "four to five hours at the jail before being released." *Id.* at 876. After he was tried and acquitted on that charge, he sued the officer for, among other things, malicious prosecution under § 1983. *Id.* at 876–77, 882. We reversed the district court's denial of qualified immunity for the officer, concluding that there was no Fourth Amendment violation. *Id.* at 882–83.

As we explained in *Williams*: "Because *Wood* both held that the officer had probable cause when the arrest occurred and considered a seizure that lasted only a few hours, it correctly resolved the claim of malicious prosecution in such a way that *made the validity of the warrant immaterial*." *Williams*, 965 F.3d at 1164 (cleaned up) (emphasis added) (quoting *United States v. Francis*, 487 F.2d 968, 971–72 (5th Cir. 1973) (holding that regardless of the sufficiency of

the arresting officer's "complaint" on which the warrant was based, he had probable cause to believe the suspect had sent heroin through the mail and "[u]nder such circumstances the arrest would have been valid without a warrant and the question of the sufficiency of the complaint becomes immaterial").

This is a case that, like *Wood*, fits within the exception described in *Williams*. To be sure, the descriptive phrase "'brief period of detention,'" *see Williams*, 965 F.3d at 1164 (quoting *Gerstein*, 420 U.S. at 114), could be more specific. But we don't need more specificity to resolve this case. We don't because *Wood* is binding precedent that four or five hours of detention is brief enough for the exception to the affidavit-facts-only rule to apply. *See id.*; *see also Wood*, 323 F.3d at 876, 882. And Harris was held in county jail for only a brief time — just "[a] few hours" by his own deposition testimony. Because there is no material distinction between four or five hours of detention and just a few hours of detention, even if we assume that Hixon's arrest warrant application contained insufficient information to establish probable cause, this case fits into the narrow category of brief detention cases in which consideration of facts outside the supporting affidavit is permitted. *See Williams*, 965 F.3d at 1164. Which means that in this case, to correctly assess probable cause under these circumstances, the validity of the warrants for Harris' arrest are — to use *Williams*' word — "immaterial"; we are permitted to consider all of the facts known to the investigators, even if those facts were not conveyed to the judicial officer issuing the warrant. *See id.*

Harris relies on *Luke v. Gulley*, 50 F.4th 90 (11th Cir. 2022), but that case does him no good in regard to the brief detention exception of *Williams* and *Wood* because it is clearly distinguishable from those two cases and this one. In *Luke* the period of detention based on the invalid warrant was anything but "a brief period of detention." It was 61 days. *Luke*, 50 F.4th at 96 ("Luke was imprisoned 61 days. A seizure of that length cannot be justified without a lawful warrant."). Two months of detention is not a brief period. But as we held in *Wood,* four or five hours is a brief period and, we hold in this case, so is just "a few hours." *Cf. County of Riverside v. McLaughlin,* 500 U.S. 44, 56 (1991) ("[W]e believe that a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of *Gerstein* [*v. Pugh*, 420 U.S. 103 (1975)].").

Nor does Harris' reliance on *Sylvester v. Fulton Cnty. Jail*, 94 F.4th 1324 (11th Cir. 2024), do anything to advance his position. In *Sylvester* the plaintiff presented evidence that the defendant officer omitted material facts from his warrant affidavit and "intentionally or recklessly left out information that exonerated" the plaintiff. *Id.* at 1327. There's no evidence that Hixon did any of that. Unlike the officer in *Sylvester*, Hixon and Bultman made some "unfortunate but reasonable mistakes," *id.*, in their misidentification of Harris as the suspect in the Redbox security videos. Not only that, but the plaintiff in *Sylvester* was held for "more than a year" in pretrial custody on a faulty arrest warrant, *id.* at 1328, which is obviously far longer than the "few hours" that Harris was held in jail.

The 61 days of pretrial detention in *Luke* and the more than a year of it in *Sylvester* put those two cases outside the brief period of detention exception recognized in *Williams*, which pointed to the four or five hours in *Wood* as an example of a brief period. The fact that the detention was for only a "few hours" in this case puts it within the *Williams* exception. That's the difference between this case and *Wood* on the one hand, and the *Luke* and *Sylvester* cases on the other.

### 2. Bultman's and Hixon's Basis for Probable Cause and Harris' Brief Detention

Probable cause existed for Harris' arrest. *See supra* at 3–17. As we have discussed, *see supra* at 9–17, our precedent holds that the reasonable, albeit mistaken, identification of a suspect is not a basis for concluding that there wasn't probable cause for an arrest. *See Rushing*, 599 F.3d at 1267. In *Rushing* we held that the officer's "arrest affidavit, although mistaken, was such that reasonable officers in the same circumstances and possessing the same knowledge" that the investigating officers had "could have believed that probable cause existed to arrest." *Id.* (cleaned up).[4] The officer's conduct in that case was "the type that qualified immunity is meant to

_____

[4] *Rushing*, like this case, involved a warrant-based arrest, but in that case the plaintiff brought a § 1983 false arrest claim instead of a claim for malicious prosecution. *See* 599 F.3d at 1265. But that difference makes no difference here because in *Rushing* we considered whether the officer who submitted the arrest affidavit had probable cause to believe that he had identified the correct suspect. *See id.* at 1267–68. That's the same question we have here.

protect: a reasonable mistake in the legitimate performance of an officer's duties." *Id.* (cleaned up).

And in *Rushing*, the investigation was handed off to a second officer, similar to how Bultman turned the case over to Hixon in this case. *See id.* at 1268–69. The second officer had "limited involvement in the investigation." *Id.* at 1268. There was no evidence that the second officer should have questioned the thoroughness of the investigation or that he should have doubted the identification of the plaintiff as the perpetrator. *See id.* at 1269. Given the second officer's limited involvement in the case, it wasn't unreasonable for him to choose not to review the entire file before he sought an arrest warrant. *See id.* We refused in *Rushing* to create "unwanted and inefficient precedent" that would require "officers, no matter how minimal their involvement in the case, to second guess the previous work of officers, and to conduct overlapping and inefficient investigations." *Id.* As a result, we affirmed the grant of summary judgment for both officers based on qualified immunity. *Id.*

Hixon, the second officer in this case, did *more* and *better* in this case than the second officer did in *Rushing*. Hixon reviewed the evidence Bultman had gathered. Along with four other officers, one of whom was his supervisor, he compared photos of Harris to the video recordings of the man who used the stolen debit card at the Redbox machines. All the officers agreed that Harris was that man. Based on his own independent review combined with the investigative work Bultman had already done, Hixon decided that

Harris was the person shown in footage using the stolen debit card. His identification was mistaken. But it wasn't unreasonable or unconstitutional.

Regardless of the sufficiency of the warrants for Harris' arrests, Bultman and Hixon conducted reasonable investigations and reasonably, albeit mistakenly, identified Harris as the man who used the stolen debit card at the Redbox machines, a man they had probable cause to arrest. *See Williams*, 965 F.3d at 1164.

There was no Fourth Amendment violation, and the investigators are entitled to qualified immunity.

**AFFIRMED.**

TJOFLAT, Circuit Judge, Concurring:

I concur in the Court's judgment but write separately because I disagree with the Court's holding on one of the two Fourth Amendment claims Harris appears to have brought against Bultman and Hixon in Counts I (Bultman) and II (Hixon) of his amended complaint. The two Fourth Amendment claims—one for false arrest and false imprisonment, and the other for malicious prosecution—are merged together in a single allegation: Bultman and Hixon respectively "caused Plaintiff George Harris to be unreasonably *arrested*, *detained*, and *prosecuted without probable cause* in violation of the Fourth Amendment's prohibition against unreasonable seizures."

The claim for false arrest and false imprisonment was based on Harris's "conten[tion] that the [officers'] investigation leading to his arrest was so inadequate that it caused him to be arrested [and detained] without probable cause in violation of his Fourth Amendment rights." Maj. Op. at 3. The Court is not persuaded. It rejects Harris's false arrest and false imprisonment claim with this statement: "Bultman's and Hixon's investigations did not violate Harris'[s] Fourth Amendment rights." *Id.* at 17. I would reject the claim because, given the undisputed facts of this case, Harris could not plead a claim for false arrest and imprisonment.

Whether the officers' investigation was inadequate is irrelevant and has no bearing on either of Harris's Fourth Amendment claims. The officers' investigation is irrelevant because it does not,

2                  [Tjoflat, J., Concurring]                22-12493

and could not, provide a foundation for a claim of false arrest and false imprisonment. The claim Harris purported to state, but did so insufficiently, was a claim for malicious prosecution. *Wallace v. Kato*, 549 U.S. 384 (2007), explains why this is so.

"False arrest and false imprisonment overlap; the former is a species of the latter." *Id.* at 388. The Court therefore "refer[ed] to the two torts together as false imprisonment." *Id.* at 389. "[T]he tort of false imprisonment is detention without legal process . . . ." *Id.* (emphasis and citation omitted). "[A] false imprisonment ends once the victim becomes held *pursuant to such process* . . . ." *Id.* "Legal process includes an arrest warrant." *Black v. Wigington*, 811 F.3d 1259, 1267 (11th Cir. 2016). "[T]he 'entirely distinct' tort of malicious prosecution" provides the remedy for the wrongful institution of the legal process. *Wallace*, 549 U.S. at 390 (citations omitted). A wrongful issuance of the warrants for his arrest is the wrongful institution of legal process that occurred here, according to Harris.

> If there is a false arrest claim, damages for that claim cover the time of detention up until issuance of process or arraignment, but not more. From that point on, any damages recoverable must be based on a malicious prosecution claim and on the wrongful use of judicial process rather than detention itself.

*Id.* (quoting W. Page Keeton, et al., *Prosser and Keeton on Law of Torts* § 119, at 888 (5th ed. 1984)).

The Court here affirms the District Court's summary judgment granting Bultman and Hixon qualified immunity from

22-12493            [Tjoflat, J., Concurring]            3

Harris's malicious prosecution claim.  I would affirm the judgment on the ground that Harris failed to make out a case of malicious prosecution as a matter of law.

The warrants for Harris's arrest were issued by a judicial officer after finding probable cause that Harris committed "financial transaction card fraud" in violation of O.C.G.A. § 16-9-33 on two occasions on January 10, 2019.  The judicial officer based her finding on the affidavit Hixon presented in support of his application for the warrants.  Hixon's affidavit was, and is, presumptively valid.  *See Franks v. Delaware*, 438 U.S. 154, 171 (1978);[1] *Williams v. Aguirre*, 965 F.3d 1147, 1162 (11th Cir. 2020).  To overcome the presumption—even to obtain an evidentiary hearing on the validity of Hixon's affidavit—Harris's probable cause attack on the warrants and their application had to be "more than conclusory and . . . supported by more than a mere desire to cross-examine" Hixon.  *Franks*, 438 U.S. at 171.  Indeed, Harris had to allege that Hixon's affidavit amounted to a "deliberate falsehood or [a] reckless disregard for the truth" and accompany his allegation with "an offer of proof."  *Id.*  Harris had to "point out specifically the portion of the warrant affidavit that [he] claimed to be false[,] and [provide] a statement of supporting reasons."[2]  *Id.*  Harris's allegation that the

_____

[1] *Franks v. Delaware* involved the validity of a search warrant in the face of a Fourth Amendment challenge regarding the truthfulness of the factual statements made in the affidavit supporting the warrant.  438 U.S. 154, 156 (1978).  The Court deemed the affidavit presumptively valid.  *Id.* at 171.

[2] And if Harris had reason to believe that the judicial officer relied on "misstatements or omissions" Bultman "intentionally or recklessly made . . . to

4                    [Tjoflat, J., Concurring]                22-12493

officers' investigation was inadequate was, and is, insufficient to re-but the presumption that Hixon's affidavit, and consequently the arrest warrants, were valid.  *See id.* ("Allegations of negligence or innocent mistake are insufficient.").

Section 1983 of Title 42 of the United States Code states, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . *subjects, or causes to be subjected*, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983 (emphasis added).

The language italicized above "plainly requires proof of an affirmative causal connection" between the actions taken by the defendant "and the constitutional deprivation."  *Williams v. Bennett*, 689 F.2d 1370, 1380 (11th Cir. 1982); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  In *Monroe v. Pape*, the Court stated that § 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his

---

support the warrant[s]" issuance, Harris could buttress his attack accordingly. *Williams v. Aguirre*, 965 F.3d 1147, 1165 (11th Cir. 2020); Maj. Op. at 26; s*ee United States v. Leon*, 468 U.S. 897, 923 n.24 (1984).

22-12493                [Tjoflat, J., Concurring]                5

actions."  365 U.S. 167, 187 (1961).  We therefore apply common law principles of causation to determine whether Bultman and Hixon can be held liable for damages under § 1983.[3]

Harris was detained pursuant to a presumptively valid legal process—the arrest warrants.  We are applying common law principles of causation when we say that a judicially authorized arrest warrant was issued on the basis of "intentionally or recklessly made misstatements or omissions necessary to support the warrant" by "an official, including an individual who did not apply for the warrant," or "that the officer who applied for the warrant should have known that his application failed to establish probable cause." *Williams*, 965 F.3d at 1165.  We are saying that the presumption of validity that clothed the application for and issuance of the arrest warrant has been rebutted.  In other words, that the arrestee's claim for malicious prosecution may go forward.

The Court's opinion here begins with the statement: "This is a case of mistaken identification."  Maj. Op. at 2.  That's all it is.  It's not even a case of negligence.  Any reasonable jurist faced with the facts that the Court's opinion meticulously sets out would find unrebutted the presumption that Hixon's affidavit and the arrest warrants are valid and would therefore affirm the District Court's summary judgment.

---

[3] I previously wrote about this same problem with different facts.  *See Jones v. Preuit & Mauldin*, 851 F.2d 1321, 1329–31 (11th Cir. 1988) (Tjoflat, J., concurring), *vacated*, 489 U.S. 1002 (1989).

6                         [Tjoflat, J., Concurring]                22-12493

I readily concur in the Court's judgment.