[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-13300

_____

ALAN RODEMAKER,

Plaintiff-Appellant,

*versus*

CITY OF VALDOSTA BOARD OF EDUCATION,
or, in the Alternative, VALDOSTA CITY SCHOOL DISTRICT,
WARREN LEE,
individually as Agent of the City of Valdosta Board of Education
and/or the Valdosta City School District,
LIZ SHUMPHARD,
individually as Agent of the City of Valdosta Board of Education
and/or the Valdosta City School District,
TYRA HOWARD,
individually as Agent of the City of Valdosta Board of Education
and/or the Valdosta City School District,
DEBRA BELL,

individually as Agent of the City of Valdosta Board of Education
and/or the Valdosta City School District,
KELISA BROWN,
individually as Agent of the City of Valdosta Board of Education
and/or the Valdosta City School District,

                                        Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 7:21-cv-00076-HL

_____

Before JILL PRYOR, BRANCH, and ED CARNES, Circuit Judges.

ED CARNES, Circuit Judge:

Coach Alan Rodemaker's contract as the head football coach at Valdosta High School was not renewed by the Valdosta Board of Education in 2020. That result followed from a vote in which all four of the white members of the Board voted to renew, but all five of the black members voted not to renew. Rodemaker believes

that all of the black members of the Board voted not to renew his contract because he is white.[1]

In 2020 Rodemaker sued the five black members of the Board of Education in their individual capacities in federal court under 42 U.S.C. §§ 1981, 1983 (*Rodemaker I*). He sought monetary damages from them. His lawsuit did not name as parties the Board itself or any of the white members of the Board. The district court denied the individual Board members' motions to dismiss on qualified immunity grounds, but we reversed that denial after concluding that Rodemaker had failed to state a claim against them. The result was judgment for the defendant board members in *Rodemaker I*.

Then came *Rodemaker II* in 2021. The complaint in it named the same black board members as before, but this time it also included the Board itself as a defendant. And it did not claim that the alleged racial discrimination was a violation of § 1981 but of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. The complaint in *Rodemaker II* includes more detailed factual allegations than the one in *Rodemaker I*, and is based on a different anti-discrimination statute, but the crux of both complaints is the same. Both

---

[1] The complaint in *Rodemaker II* uses the racial identifiers "black" and "African American" interchangeably. It also uses the term "white," except for three occasions on which "Caucasian" is used. For internal consistency, we will use the terms "black" and "white" when referring to race. And we will follow the predominate practice in the complaints of not capitalizing either the "b" or the "w," except at the beginning of sentences.

complaints claim that the Board and its black members discriminated against Rodemaker based on his race when his contract was not renewed. He sought monetary damages in both lawsuits.

In the present lawsuit, *Rodemaker II*, the Board moved for summary judgment, contending that because of the judgment in *Rodemaker I* res judicata barred the claim against the defendants in this lawsuit. The district court granted the motion after determining that the Board was in privity with the board member defendants because they had been acting as its agents when they decided not to renew Rodemaker's contract and that, despite the different legal labels for the claims, *Rodemaker I* and *II* involve the same cause of action. We agree.

## I . BACKGROUND[2]

### A. *RODEMAKER I*

#### 1. Allegations in *Rodemaker I*

Rodemaker filed his first lawsuit, *Rodemaker I*, in federal court in April 2020. It named as defendants the five black members of the Valdosta Board of Education — Warren Lee, Liz Shumphard, Tyra Howard, Debra Bell, and Kelisa Brown — in

---

[2] In its motion for summary judgment based on res judicata, the Board relied on the historical facts alleged in the *Rodemaker I* and *Rodemaker II* complaints, and in this appeal Rodemaker has not raised any issue with that reliance or with any of those historical facts. We will go along with their approach in recounting the facts, even though this is an appeal from the grant of summary judgment and not from the grant of a motion to dismiss.

their individual capacities. It claimed racial discrimination in violation of 42 U.S.C. §§ 1981 and 1983 against all five defendants, seeking monetary damages and attorney's fees.

The *Rodemaker I* complaint alleged that Rodemaker had been the head football coach at Valdosta High School in Georgia, where he once won the State 6A Championship and twice made it to the State 6A quarterfinals. He had also been a gym teacher at Valdosta and had "accepted a school contract with the Valdosta Board of Education on an annual basis for each of the last ten years." As both a football coach and teacher, his "reviews and reputation [were] exemplary."

In January 2020, the contracts of 151 teachers and coaches were up for annual renewal by the Valdosta Board of Education. According to the complaint, the racial makeup of the Board "had recently changed" from five white members and four black members to four white members and five black members.

When it came time to renew the teachers' and coaches' contracts, board member Lee moved to consider Rodemaker's contract separately from the 150 other contracts up for renewal. All 150 other contracts were renewed. But by a 5-4 margin along racial lines, the Board voted not to renew Rodemaker's contract. None of the board members who voted against renewing Rodemaker's contract provided any reason for their decision.

The Board held a second vote on Rodemaker's contract in February 2020, but the Board again voted along racial lines not to renew the contract. At the meeting, white board member Kelly

Wilson stated that "the actions of the School Board with regard to Coach Rodemaker were not only improper, but probably illegal." Rodemaker contended that his contract was not renewed because the black board members wanted to hire a black football coach. He claimed that "the conspiracy to non-renew Coach Rodemaker occurred in illegal meetings" with the black board members.

### 2. Procedural History of *Rodemaker I*

All five defendants filed motions to dismiss, contending that they were entitled to qualified immunity. The district court denied the motions to dismiss, and the defendants filed an interlocutory appeal of the order. In June 2021 we reversed the denial of the defendants' motions to dismiss, holding that the complaint failed to state a claim. *See Rodemaker v. Shumphard*, 859 F. App'x 450, 453 (11th Cir. 2021). We remanded the case to district court for dismissal. *See id.*

### B. *RODEMAKER II*

While *Rodemaker I* was pending before the district court, Rodemaker filed two charges of discrimination with the United States Equal Employment Opportunity Commission (EEOC), one against the Valdosta Board of Education and one against the Valdosta City School District. And while the *Rodemaker I* defendants' interlocutory appeal was pending, the EEOC issued a right to sue letter for both charges. *See generally Forehand v. Fla. State Hosp. at Chattahoochee*, 89 F.3d 1562, 1567 (11th Cir. 1996) (describing the EEOC's right to sue process).

### 1. Allegations in *Rodemaker II*

Ten days after we remanded *Rodemaker I* to the district court, Rodemaker filed the complaint that forms the basis of this lawsuit, *Rodemaker II*. It named as defendants the City of Valdosta Board of Education, as well as the five black board members.[3] It contained a race discrimination claim under Title VII against the Board, a race discrimination claim under Title VII against the board members, and a conspiracy claim against the board members. It sought compensatory and punitive damages as well as attorney's fees under 42 U.S.C. § 2000e-5(k) and O.C.G.A. § 13-6-11. The claim against the board members under Title VII alleged that they "acted as agents" of the Board when they voted not to renew his contract.

The factual allegations in the *Rodemaker II* complaint are materially identical to those in *Rodemaker I*, albeit slightly more detailed. What follows is a recounting of those allegations.

Rodemaker was the head football coach at Valdosta High School, where he once won the State 6A Championship and twice made it to the State 6A quarterfinals. He was also a gym teacher at Valdosta and in both positions was an employee of the Board. As both a football coach and teacher, his "reviews and reputation were

---

[3] The complaint does not clearly state in what capacity the five board members were being sued. Rodemaker contends that he sued them in their official capacity. But because he appeals only the grant of summary judgment against the Board, and not the dismissal of the claims against the individual board members, the capacity in which he sued the board members in *Rodemaker II* is not relevant.

exemplary," and there were no complaints or any evidence of misconduct in his personnel file.

The Board was required to consider for renewal on a yearly basis Rodemaker's employment. It had renewed his contract every year from 2010 through 2019. But before the vote on renewal of Rodemaker's contract for the 2020–2021 school year, the racial makeup of the Board had changed from a majority-white board to a majority-black board, on which five of the nine board members were black. The five black board members were Warren Lee, Liz Shumphard, Tyra Howard, Debra Bell, and Kelisa Brown. They "participated in public meetings where they discussed their intent" to vote to non-renew Rodemaker's contract in order to replace him with a black head coach. The black board members also texted and emailed among themselves "regarding their concerted plan to vote to non-renew Coach Rodemaker as the Head Football Coach." And black board member Lee had made comments in the past that "Valdosta High School needed a head football coach of color" and had insisted that job applications submitted to the Board should indicate whether the applicant was black or white.

For the 2020 school year, the Valdosta City Schools Superintendent had recommended that the Board renew Rodemaker's contract for another year. Generally, once the Superintendent recommended renewal of a contract, the Board would "vote on all of the Superintendent[']s recommendations for rehire in one vote."

But at the January 2020 board meeting, "Lee requested that the recommendation to renew Coach Rodemaker[']s football

coaching contract be considered separately" from all other recommendations. The Board then separated the personnel list into two groups, an A list and a B list. All other school system personnel were on the A list, and Rodemaker was the only employee on the B list.

The Board members discussed the renewal matters in private during an executive session. The Board then returned to a public session to vote. A white board member moved to renew Rodemaker's employment contract, but that motion was defeated by a 4-5 vote along racial lines. The five black board members who voted to non-renew Rodemaker's contract did not explain why they did so.

In response to public outcry, the Board planned to reconsider the non-renewal of Rodemaker's contract at a February 2020 meeting. At the meeting, Lee moved to strike reconsideration of Rodemaker's contract from the agenda, but the motion was defeated by a vote of 4-5, with Lee, Shumphard, Howard, and Brown voting to remove consideration of the matter from the agenda, while Bell voted with the four white board members to leave it on the agenda. The Board then heard comments from the public about whether it should renew Rodemaker's contract. Five black members of the community spoke against renewing Rodemaker's contract. They made comments: "urg[ing] the black members of the School Board to 'stand together'"; reminding those members they were "'put there' by black votes"; and "impl[ying] that black football players had been used by the white establishment . . .

without regard to the well-being of the black players." Seven people, some of them black and some of them white, spoke in support of renewing Rodemaker's contract.

After hearing the public comments, the Board again discussed the vote in private. Once the board members returned to the public forum to vote, a white board member again moved to renew Rodemaker's contract. And again the motion was denied, with the board members voting entirely along racial lines. The board members who voted against renewing Rodemaker's contract did not give a reason for their decision. One of the white board members later "confirmed that race was a factor" in the vote.

The black board members sought to replace Rodemaker with a black coach. But after they were unable to find a black candidate, the Board voted along racial lines to hire "controversial football coach Rush Pro[p]st." After Propst was removed as coach in April 2021 for illegally recruiting players, the Board hired a black man as interim head coach.

### 2. Procedural History of *Rodemaker II*

The board members moved to dismiss Rodemaker's complaint on the merits. A couple months later, the Board filed a motion for summary judgment, arguing that Rodemaker's claims against it are barred by res judicata. Specifically, the Board argued that it was in privity with the board members sued in *Rodemaker I* because they were its agents and the causes of action in the two cases are the same. It also argued (for the first time in its reply brief) that it was in privity with the board members because "[t]he School

Board controlled the litigation [in *Rodemaker I*]. Counsel for the Board had defended all five Individual Defendant Board Members and necessarily consulted with the School Board throughout the course of the prior litigation," i.e., during *Rodemaker I*.

The district court granted the board members' motions to dismiss and entered judgment for them, a judgment which is not contested in this appeal. It also granted the Board's motion for summary judgment, which is contested in this appeal.

The district court granted summary judgment for the Board on res judicata grounds after determining that it was in privity with the board members because their votes not to renew Rodemaker's contract were cast as agents of the Board. Privity existed, the court reasoned, because the board members acted as agents of the Board in *Rodemaker I*, the Board and the board members shared a "commonality of interests for purposes of defending against [Rodemaker's] claim," and because Rodemaker did "not dispute [the Board's] assertion that the School Board provided counsel for the [board members] in the previous action and exerted substantial control over the defense." The court also determined that *Rodemaker I* and *II* shared the same cause of action because the claims in both arose out of the same nucleus of operative facts.

This is Rodemaker's appeal of the district court's entry of judgment in favor of the Board in *Rodemaker II* based on res judicata.

## II. THE ELEMENTS OF RES JUDICATA AND THE APPLICABLE STANDARD OF REVIEW FOR IT

Res judicata prevents plaintiffs from bringing claims related to prior decisions when "the prior decision (1) was rendered by a court of competent jurisdiction; (2) was final; (3) involved the same parties or their privies; and (4) involved the same causes of action." *TVPX ARS, Inc. v. Genworth Life & Annuity Ins. Co.*, 959 F.3d 1318, 1325 (11th Cir. 2020).

In their briefing, both parties contend that we should "review *de novo* a district court's determination of res judicata," but that "whether a party is in privity with another for preclusion purposes is a question of fact that is reviewed for clear error." *EEOC v. Pemco Aeroplex, Inc.*, 383 F.3d 1280, 1285 (11th Cir. 2004). As it turns out, it's a little more cloudy than that because there is an intra-circuit conflict in our decisions about the standards of review for privity determinations.

At least a half dozen of our decisions review questions of privity only for clear error. *See ADT LLC v. NorthStar Alarm Servs., LLC*, 853 F.3d 1348, 1351 (11th Cir. 2017) ("Whether a party is in privity with another party is a question of fact that we review for clear error."); *CSX Transp., Inc. v. Gen. Mills, Inc.*, 846 F.3d 1333, 1340 (11th Cir. 2017) ("Privity is a factual question which should not be reversed unless its determination is clearly erroneous.") (quoting *Hart v. Yamaha-Parts Distribs., Inc.*, 787 F.2d 1468, 1472 (11th Cir. 1986)) (cleaned up); *Baloco v. Drummond Co., Inc.*, 767 F.3d 1229, 1246 (11th Cir. 2014) ("[W]hether a party is in privity with another for preclusion purposes is a question of fact that is reviewed for clear error.") (quotation marks omitted); *Griswold v.*

*Cnty. of Hillsborough*, 598 F.3d 1289, 1292 (11th Cir. 2010) ("[W]hether a party is in privity with another for preclusion purposes is a question of fact that is reviewed for clear error.") (quotation marks omitted); *Pemco Aeroplex*, 383 F.3d at 1285 ("[W]hether a party is in privity with another for preclusion purposes is a question of fact that is reviewed for clear error."); *Hart*, 787 F.2d at 1472 ("A district court's determination as to whether interrelated corporations are in privity with each other is a factual question which should not be reversed unless its determination is clearly erroneous."); *Astron Indus. Assocs., Inc. v. Chrysler Motors Corp.*, 405 F.2d 958, 961 (5th Cir. 1968) ("This determination of identity between litigants for the purpose of establishing privity is a factual question, and the District Court should not be reversed unless its determination is clearly erroneous.").[4]

But some of our other decisions apply *de novo* review to all elements of res judicata, including privity. *See Herman v. S.C. Nat'l Bank*, 140 F.3d 1413, 1424 n.17 (11th Cir. 1998) ("Application of res judicata presents questions of law reviewed *de novo*."); *NAACP v. Hunt*, 891 F.2d 1555, 1560 (11th Cir. 1990) ("A district court's conclusions as to *res judicata* are conclusions of law, and are thus reviewable *de novo* by this Court."); *id.* at 1561 ("The question of whether sufficient privity exists to warrant application of res judicata is a question of law.") (citing *Sw. Airlines Co. v. Tex. Int'l*

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

*Airlines, Inc.*, 546 F.2d 84, 95 (5th Cir. 1977)) (explaining that "federal cases have recognized that 'privity' denotes a legal conclusion"); *McDonald v. Hillsborough Cnty. Sch. Bd.*, 821 F.2d 1563, 1564 (11th Cir. 1987) ("The district court's determination regarding the availability of *res judicata* as a defense is a conclusion of law. Thus, whether or not *res judicata* is available is totally reviewable.") (citation omitted); *see also Consumer Fin. Prot. Bureau v. Ocwen Fin. Corp.*, 30 F.4th 1079, 1083 n.1 (11th Cir. 2022) (stating, in a case where privity was not at issue, that "[b]ecause barring a claim on the basis of res judicata is a determination of law, our review is de novo") (cleaned up); *Maldonado v. U.S. Att'y Gen.*, 664 F.3d 1369, 1375 (11th Cir. 2011) (stating that "[b]ecause *res judicata* determinations are pure questions of law, we review them *de novo*," but where privity was not at issue) (quotation marks omitted); *In re Piper Aircraft Corp.*, 244 F.3d 1289, 1295 (11th Cir. 2001) (explaining that "[a] court's application of res judicata presents questions of law reviewed de novo," but not reaching the privity question); *Sewell v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 94 F.3d 1514, 1517 (11th Cir. 1996) (asserting that "[t]he application of *res judicata* principles to [the plaintiff's] claims constitutes a pure question of law which this court reviews *de novo*," but where privity was not at issue).

The conflict is also reflected one place removed in opinions discussing whether privity is a question of fact or a question of law. *Compare Sellers v. Nationwide Mut. Fire Ins. Co.*, 968 F.3d 1267, 1275–76 (11th Cir. 2020) (stating in an issue preclusion case involving the application of Alabama law that "[w]hether parties were in privity is a factual question that should be decided in the first instance by

the district court") (quotation marks omitted), *with Riddle v. Cerro Wire & Cable Grp., Inc.*, 902 F.2d 918, 921–22 (11th Cir. 1990) (explaining that when determining if res judicata bars a subsequent action, it's "a question of law" whether the plaintiff has "sufficient identity of interests . . . so that she may be treated as a party for preclusion purposes").

Were we deciding the issue as one of first impression, we might well hold that privity is a mixed question of law and fact. *See Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19 (1982) (explaining that a mixed question of law and fact is a "question[] in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard"). And for mixed questions of law and fact, we normally review the underlying factual determinations for clear error, while reviewing *de novo* the district court's application of facts to law. *See In re Am.-CV Station Grp., Inc.*, 56 F.4th 1302, 1309 (11th Cir. 2023) ("Because these determinations are mixed questions of law and fact, we review them de novo."); *R.L. v. Miami-Dade Cnty. Sch. Bd.*, 757 F.3d 1173, 1187 (11th Cir. 2014) ("[M]ixed questions of law and fact we review *de novo*."); *Chandler v. Crosby*, 379 F.3d 1278, 1288 (11th Cir. 2004) ("We review de novo the district court's resolution of questions of law and of mixed questions of law and fact.") (alteration adopted) (quotation marks omitted); *see also McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005) ("The district court's factual findings are reviewed for clear error, while mixed questions of law and fact are reviewed *de novo*.").

But the question is not before us as a matter of first impression. We must follow precedent embodied in published opinions. And in situations like this one where there is conflicting precedent, an intra-circuit conflict, we follow the precedent set out in our "well-established approach to resolving conflicts in our precedent." *Washington v. Howard*, 25 F.4th 891, 899 (11th Cir. 2022) (quotation marks omitted). It prescribes that we first try to find a "basis of reconciliation from the apparently conflicting decisions and then apply that reconciled rule." *Id.* at 900 (quotation marks omitted). If that is not possible, then "we must follow the earliest precedent that reached a binding decision on the issue." *Id.* (quotation marks omitted).

Here, the application of two completely different standards of review cannot be reconciled. *De novo* review is not clear error review, nor is there any other apparent basis for reconciling the two lines of precedent. So we apply our earliest binding precedent on the issue. As far as we can tell, that earliest precedent is the 1968 pre-split Fifth Circuit decision in *Astron Industrial Associates, Inc. v. Chrysler Motors Corp.*, which held that "privity is a factual question, and the District Court should not be reversed unless its determination is clearly erroneous." 405 F.2d at 961 (*citing Towle v. Boeing Airplane Co.*, 364 F.2d 590, 593 (8th Cir. 1966)). Accordingly, we apply clear error review to determine if the board members are in

privity with the Board, and we review *de novo* the district court's determination of the remaining res judicata elements.[5]

## III. DISCUSSION

The preclusive effect of prior judgments in federal court is governed by "uniform federal rules of res judicata." *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008) (alterations accepted) (quotation marks omitted). The purpose behind the doctrine of res judicata is to "preclud[e] parties from contesting matters that they have had a full and fair opportunity to litigate" and to "protect against the expense and vexation attending multiple lawsuits, conserve judicial resources, and foster reliance on judicial action by minimizing the possibility of inconsistent decisions." *Id.* at 892 (alterations adopted) (quotation marks omitted).

The party asserting res judicata bears the burden of "show[ing] that the later-filed suit is barred." *In re Piper Aircraft Corp.*, 244 F.3d at 1296. That's the Board, which contends that the district court properly granted summary judgment in its favor because *Rodemaker II* is barred by res judicata based on *Rodemaker I*. There is no dispute that two of the four elements of res judicata are met: (1) a court of competent jurisdiction, (2) rendered a final decision. *See Rodemaker I*, 859 F. App'x at 453.

The other two res judicata elements are the disputed ones: whether the two lawsuits involve (3) the same parties or ones in

---

[5] For whatever it is worth, we do not think that it would change the result of this appeal if we were reviewing *de novo* instead of for clear error.

privity with them and (4) the same causes of action.  Rodemaker contends that the defendants in *Rodemaker I*, the board members sued in their individual capacities, are not in privity with the remaining defendant in *Rodemaker II*, the Board.  He also argues that the causes of action in the two cases are different.  We will take up those issues in that order.

## A.  PRIVITY

Privity is not a concept whose boundaries have been staked out with mathematical precision.  It has been somewhat circularly defined as the "relationship between one who is a party of record and a nonparty that is sufficiently close so a judgment for or against the party should bind or protect the nonparty."  *Hunt*, 891 F.2d at 1560 (quotation marks omitted); *see also Sw. Airlines Co.*, 546 F.2d at 95 ("[T]he term privity in itself does not state a reason for either including or excluding a person from the binding effect of a prior judgment, but rather it represents a legal conclusion that the relationship between the one who is a party on the record and the nonparty is sufficiently close to afford application of the principle of preclusion.") (footnote omitted); *Pemco Aeroplex*, 383 F.3d at 1286 (explaining that "privity" is "a flexible legal term" that "compris[es] several different types of relationships," and generally applies "when a person, although not a party, has his interests adequately represented by someone with the same interests who is a party").

More helpful is the non-exhaustive list of facts or factors the Supreme Court has provided that favor a finding of privity:

> (1) the nonparty agreed to be bound by the litigation of others; (2) a substantive legal relationship existed between the person to be bound and a party to the judgment; (3) the nonparty was adequately represented by someone who was a party to the suit; (4) the nonparty assumed control over the litigation in which the judgment was issued; (5) a party attempted to relitigate issues through a proxy; or (6) a statutory scheme foreclosed successive litigation by nonlitigants.

*Griswold*, 598 F.3d at 1292 (citing *Taylor*, 553 U.S. at 893–95); *see Taylor*, 553 U.S. at 893 & n.6 (explaining that this list "is meant only to provide a framework" for consideration of privity issues, "not to establish a definitive taxonomy").

Rodemaker argues that because he sued the board members in their individual capacity in *Rodemaker I*, they cannot be in privity with the Board in this case. That brings up the difference between individual capacity and official capacity claims. Claims against individuals in their official capacities "generally represent only another way of pleading an action against an entity of which an officer is an agent," and are "in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (quotation marks omitted). That's because an award of damages in an official capacity suit is paid by the government entity itself, so that entity is the real party in interest in that type of lawsuit. *Id.* at 166. A lawsuit against an individual in his individual capacity, by contrast, "can be executed only against the official's personal assets," meaning that the government itself is not

responsible for any damages award from the suit (although, of course, it may voluntarily pay them to relieve its official of the burden of personally doing so). *Id.*

If the government is on the hook for damages in a lawsuit against an official in his official capacity, it should not later have to be on the hook for damages again based on the same conduct in a different lawsuit where it is a named defendant. So it makes sense that "[g]enerally, a government official sued in his or her official capacity is considered to be in privity with the government, but a government official sued in his or her individual capacity is not." *Lozman v. City of Riviera Beach*, 713 F.3d 1066, 1075 n.7 (11th Cir. 2013); *cf. O'Connor v. Pierson*, 568 F.3d 64, 71 (2d Cir. 2009) (holding that members of a board of education sued in their official capacity were in privity with the Board). Because the board members were sued in their individual capacity in *Rodemaker I*, official-capacity-and-entity privity is not present here. But that does not mean that another type of, or basis for, privity does not exist here.

The Supreme Court has told us that there are other ways for privity to exist. *See Taylor*, 553 U.S. at 893–95. The question is whether the relationship between the parties in question was "sufficiently close so a judgment for or against the [individuals] should bind or protect the [Board]." *Hunt*, 891 F.2d at 1560 (quotation marks omitted). And where, as here, the five board members were able to take the action they took because they controlled the Board, the law slaps a privity label on the relationship and treats what the members did as action by the Board. When one party's actions are

*legally* another party's actions, those two parties have the kind of substantive legal relationship that establishes privity. *See Harmon Indus., Inc. v. Browner*, 191 F.3d 894, 903 (8th Cir. 1999) ("Privity exists when two parties to two separate suits have a close relationship bordering on near identity") (quotation marks omitted).

Contrast the relationship between the board member defendants and the Board to the relationship between a police officer and the police department for which he works. While performing his official duties, the police officer acts as a representative of the police department, but he cannot reasonably be said to be acting as the department, at least not when he is sued in his individual capacity. He can't be said to be the department because he does not control the department. But here, the five board members, when performing their official duties and acting as a majority of the board, do control the Board; as the controlling majority, they are acting as the Board. Their collective decision not to renew Rodemaker's contract was a decision of the Board and resulted in the non-renewal of the contract.

Our decision about this is consistent with the precedent of other circuits. *See Schuster v. Martin*, 861 F.2d 1369, 1373 (5th Cir. 1988) (holding that members of a hospital's board of trustees were in privity with the hospital under Mississippi law because "[a]ll of the allegations made by [the plaintiff] refer to actions taken by [the board members] as members of [the hospital's] board or executive committee. Moreover, only these entities could have taken the actions complained of"); *Licari v. City of Chicago*, 298 F.3d 664, 667 (7th

Cir. 2002) (holding that members of a policemen's retirement board sued in their individual capacity were in privity with the Board itself under Illinois law because "a government and its officers are in privity for purposes of *res judicata*" and the plaintiff "does not allege any action taken against him by the [board members] . . . that is separate and distinct from any action taken by the Board"); *Harmon*, 191 F.3d at 903 (finding privity where two parties to two separate suits "have a close relationship bordering on near identity") (quotation marks omitted).

The district court did not err at all, much less clearly err, in determining that the Board is in privity with the five of its nine members who were sued in their individual capacity in *Rodemaker I*.[6]

### B.  SAME CAUSE OF ACTION

---

[6] Rodemaker also argues that the district court erred in considering the Board's argument, raised for the first time in its reply brief, that it is in privity with the board members because, even though it wasn't a party in *Rodemaker I*, it "controlled the litigation." *Cf. Taylor*, 553 U.S. at 895 (explaining that "a nonparty is bound by a judgment if she assumed control over the litigation in which that judgment was rendered") (alteration adopted) (quotation marks omitted).  We need not consider that issue because it does not affect our reasoning or conclusion.  There was privity regardless of whether the Board controlled the litigation on the defense side in *Rodemaker I*.

And for the same reason, we need not consider the Board's argument based on *Citibank, N.A. v. Data Lease Fin. Corp.*, 904 F.2d 1498 (11th Cir. 1990), that it is in privity with the board members because they acted as its agents in voting to non-renew Rodemaker's contract.

Rodemaker also contends that the district court erred in concluding that *Rodemaker I* and *Rodemaker II* involve the same causes of action because (1) §§ 1981 and 1983 are different statutes with causation standards different from those of Title VII, and (2) he sued different parties in *Rodemaker II* than he did in *Rodemaker I*. We are not persuaded.

Determining whether two cases involve the same cause of action for the purposes of res judicata is an inquiry "concerned with the substance, and not the form, of the [two] proceedings." *Trustmark Ins. Co. v. ESLU, Inc.*, 299 F.3d 1265, 1270 (11th Cir. 2002). We ask whether the claims "arise[] out of the same nucleus of operative facts, or [are] based upon the same factual predicate." *TVPX ARS, Inc.*, 959 F.3d at 1325 (quotation marks omitted). Causes of action share a nucleus of operative fact if "the same facts are involved in both cases, so that the present claim could have been effectively litigated with the prior one." *Lobo v. Celebrity Cruises, Inc.*, 704 F.3d 882, 893 (11th Cir. 2013) (quotation marks omitted). But if "full relief [was not] available in the first action," res judicata does not bar the second action. *TVPX ARS, Inc.*, 959 F.3d at 1325 (quotation marks omitted).

The claims in both *Rodemaker* lawsuits grew out of the same nucleus of operative fact and were based on the same factual predicate: the allegedly racially discriminatory decision not to renew Rodemaker's employment contract. While there were more factual allegations and specifics about the non-renewal of the contract in the second lawsuit, the non-renewal was at the center or core of

both complaints. Factual allegations do not need to be identical to arise out of the same nucleus of operative fact. The nucleus is the core, not the core and every layer, crack, and fissure.

That the *Rodemaker I* complaint contained claims under §§ 1981 and 1983 while the *Rodemaker II* complaint contained claims brought under Title VII is not relevant to the inquiry. *See Lobo*, 704 F.3d at 893 (holding that Seaman's Wage Act claim and Labor Management Relations Act claims arose from the same nucleus of operative fact because the plaintiff alleged the same facts as the basis for both claims). Res judicata "applies not only to the precise legal theory presented in the prior case, but to all legal theories and claims arising out of the same nucleus of operative fact." *Hunt*, 891 F.2d at 1561. Because legal theories are different from operative facts, a different legal theory does not necessarily mean a different nucleus of operative fact.

Nor is the fact that the different claims may have been subject to different standards of proof relevant. *See Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1188 (11th Cir. 2003) (explaining that "the fact that the elements of proof in the context of [the second claim] differ from those at issue in [the first claim] is not a basis on which we may hold res judicata to be inapplicable").

Rodemaker argues that he would have had to add the Board as a party to *Rodemaker I* to bring his Title VII claim in that lawsuit because Title VII claims cannot be brought against individuals. *See Hinson v. Clinch Cnty., Ga. Bd. of Educ.*, 231 F.3d 821, 827 (11th Cir. 2000). From that he argues that the two complaints involved

different causes of action. But there was nothing preventing him from naming the Board as a party in *Rodemaker I*. *See* Fed. R. Civ. P. 20(a)(2)(B) (allowing a plaintiff to join any party as a defendant if "any question of law or fact common to all defendants will arise in the action"). And, in any event, the identity of the defendant against whom claims are brought is not relevant to the inquiry about the same cause of action element: whether the claims share a common nucleus of operative fact. *See Lobo*, 704 F.3d at 893. Similarity of parties is covered in the privity element of res judicata, and as we explained earlier, the privity requirement is met here. *See supra* at 22.

In the district court, Rodemaker argued that he could not have brought his Title VII claim in *Rodemaker I* because the EEOC had not yet issued him his right to sue letters. Thus he contended that *Rodemaker I* could not be the same cause of action as *Rodemaker II* because "full relief [was not] available in" *Rodemaker I*. *TVPS ARS, Inc.*, 959 F.3d at 1325 (quotation marks omitted). The district court rejected that argument, and properly so. We have held that the fact a plaintiff did not have when he filed his first lawsuit a right to sue letter that was necessary for the claim he raised in his second lawsuit does not prevent it from being barred by res judicata. *See Jang v. United Techs. Corp.*, 206 F.3d 1147, 1149 (11th Cir. 2000) (explaining that "plaintiffs may not split causes of action to bring, for example, state law claims in one suit and then file a second suit with federal causes of action after receiving a 'right to sue' letter"). Rodemaker argues that *Jang* is inapplicable "because the critical element for the application of res judicata — identity of parties — existed" in *Jang*

26                    Opinion of the Court                22-13300

but does not exist here.  But that attempted distinction fuses the privity element and the same cause of action element.  They are distinct elements, and neither one requires that parties be identical for res judicata to apply.  Rodemaker's attempt to distinguish *Jang* doesn't work.

Rodemaker I and Rodemaker II involved the same causes of action.  That means all four elements of res judicata are met, and the district court properly granted summary judgment in favor of the Board in *Rodemaker II*.

## III. CONCLUSION

Res judicata is concerned with substance over form.  Claims that are based on the same issues and involve the same entities should generally be litigated together.  In the present lawsuit, Rodemaker seeks to relitigate a dispute already decided in *Rodemaker I*. He had a "full and fair opportunity to litigate" the dispute in that first lawsuit.  *Taylor*, 553 U.S. at 892 (quotation marks omitted). Our application of res judicata to bar his attempted do-over in this second lawsuit carries out the purposes of res judicata, which are to "conserve judicial resources" and "minimiz[e] the possibility of inconsistent decisions."  *Id.* (alteration adopted) (quotation marks omitted).

**AFFIRMED.**